*In the*

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| In Re: ESTATE OF EVA C. PUPPOLO By: Celeste A. Puppolo, Executor | * | |
| and | * | Case No.: |
| Celeste A. Puppolo,  Individually, *Plaintiffs* | * | 2:24-cv-1238 |
| *v.* | * | |
| R. PETER DECATO, ESQ DECATO LAW OFFICE, P.C., | * | |
| and | | |
| Each Employee or Officer of Decato Law Office or Surety or Any Unknown Parties or Persons Who Caused Harm to Plaintiffs, | * * | |
| *Defendants* | * | |

## <u>COMPLAINT</u>

COMES NOW the Estate of Eva C. Puppolo, by Executor of the Estate Celeste A. Puppolo, and Celeste A. Puppolo, Individually, and in support of this Complaint files a Statement of Claims pursuant to Federal Rules of Civil Procedure Rule 8 on grounds stated in Plaintiff's Statement of Facts. Facts are stated with specificity and particularity as required by Federal Rule of Civil Procedure 9(a) and (b) and presented as: I) Fraud Upon the Vermont Courts and II) Fraud upon the Estate and its Executor, Celeste A. Puppolo, as well as Celeste A. Puppolo, Individually.

All attached exhibits are submitted as documentary evidence in support thereof and are incorporated by this reference. Plaintiffs state as follows:

## PARTIES

1.      The Estate of Eva C. Puppolo, by Executor of the Estate Celeste A. Puppolo, is probated in the Vermont Superior Court Probate Division.

2.      Celeste A. Puppolo, individually, is domiciled in The Commonwealth of Massachusetts where she resides at 218 Corinth Street, North Adams, Massachusetts 01247.

3.      Celeste A. Puppolo conducts business in the State of Maryland also, and resides part time at 8719 Reading Road, Silver Spring, MD 20901.

4.      Eva C. Puppolo, decedent, who died of fentanyl intoxication at Crescent Manor Care Centers in Bennington, Vermont, was the aunt of Celeste A. Puppolo.

5.      R. Peter Decato, Esquire practices law in the State of Vermont and is a resident of New Hampshire. Decato Law Office is situated at 84 Hanover Street, Lebanon, NH 03766.

## JURISDICTION

6.      This Court has jurisdiction because Plaintiff Estate and the Estate executor, and Defendants' practice of law are in different states. Their controversy involves disputed issues of fundamental rights, and the amount in controversy exceeds $75,000.00.

## STATUTE OF LIMITATIONS

7.      Fraud upon this Court, suppression of fraud in prior litigation, fraudulent misrepresentation, false inducement and breach of contract are relatively recently discovered, with advice of Undersigned Counsel, and presented herein for the first time as new evidence.

Docket # 2:24-cv-1238

8.      Said evidence was withheld by previously retained counsel for the Estate with the intent to deceive and fraudulently concealed to aid and abet prior frauds consisting of attorney signature forgery of the case medical examiner and deceptive conduct by retained attorneys in breach of their fiduciary duties. Their duties were fraught with both deceptive conduct and fraudulent inducement.

9.      Based upon circumstantial and actual evidence, consisting of testimony and documentary evidence, fraud in this case is presented in specificity and with particularity as required by Federal Rule of Civil Procedure 9(b).

10.     Upon information and belief, Defendants' abetting fraud is based on specific facts and events that occurred in the presence of bribery, obstruction, and the withholding of verified evidence needed to be presented to the U.S. District Court for the District of Vermont. Acts of fraud were committed by prior identified defendants who purported (falsely) to represent, in accordance with required fiduciary standard, their clients, Plaintiffs herein. Plaintiffs aver that all conditions precedent, contractual and statutory, have been performed and/or have occurred and been met as articulated and as supported by exhibits herein.

11.     R. Peter Decato and Decato Law Office ("Mr. Decato" or "Defendants") withdrew their representation from the above-captioned Estate of Eva C. Puppolo on June 20, 2022.

12.     On November 21, 2018, Mr. Decato, whom the Estate executor implicitly entrusted all matters of the Estate from his retainment on August 1, 2015, used undue influence to subject the Estate executor to a deal proposed by opposing counsel that seemed, to the executor, to better the interests of adverse parties John J. Welch, Jr. and John J. Welch, Jr., LTD, defendants in U.S. District Court for the District of Vermont Case 5:14-cv-00095.

Mr. Decato employed the same tactic used by his predecessor John J. Welch, Jr., Esq. who after trial pressured the Estate executor to accept a bribe in exchange for her dropping any continuation of the case. Mr. Welch had declared in writing to the Estate executor "that the Defense was prepared to drop its Motion For Costs, a copy of which I mailed to North Adams, provided that you would be willing to drop your Motion For New Trial and Appeal." (*See*, Exhibit 1, Email of Mr. Welch to the Estate executor.)

13.    Mr. Decato exercised the same coercive objective, as patterned after Mr. Welch, when he pressured the Estate executor, contrary to all written and oral agreements pursuant to his retainment to accept a pay-off from defendants in exchange for dropping any further pursuit of the case. However, the Estate executor refused to accept money from Mr. Welch via Mr. Decato in an undisclosed, unauthorized, unlawful, oppressive and extortionate deal.

14.    When the Estate executor refused the briberous deal, Mr. Decato then appealed the case without any meaningful disclosure of the prior frauds in this matter, *infra*, and did so antithetical to case material facts. Mr. Decato refused to file a motion for reconsideration or, later, a petition for certiorari and continued to represent the Estate until June 20, 2022.

15.    On July 7, 2022, Mr. Decato had fraudulently effected discharge of the Estate executor's Letters of Administration in Vermont Superior Court, as a blatant and obvious act to disenable and obstruct her from bringing the instant Complaint for fraud against him. This fact was unknown to the Estate executor at the time the events were occurring and was reversed by Superior Court Judge Lon McClintock who reinstated the Estate executor.

16.    Mr. Decato, throughout his tenure, secretively committed acts of consumer fraud, *infra*, as he fraudulently misrepresented facts regarding the services he was providing despite the Federal Trade Commission's mandate to thwart deceptive advertising that

includes the fraud of attorneys engaged in the commercial entrepreneurial aspects of the practice of law. (*Kessler v. Loftus*, 994 F.Supp. 240 (1997) and *Bridge v. Corning*, 997 F.Supp. 551 (1998))

17.    The above-cited monetary bribe by Mr. Decato was an act straight from the playbook of Mr. Welch who, in his tenure preceding Mr. Decato, clandestinely arranged to pay $7,223.10 of the Estate's funds, held exclusively in escrow trust to compensate the Estate's premier medical expert for his trial testimony, to Christopher Dodig, Esq., defendant, in an exchange for Mr. Dodig's conceding to legal malpractice at trial.

18.    Mr. Welch's machinations and $7,223.10 bribe were secretly carried out unbeknown to the Estate executor. His last act of sabotage changed the facts of the case moments before the Jury convened to deliberate, *infra.* On receiving payment of $7,223.10, Mr. Dodig conceded to legal malpractice, and the Jury quickly found in favor of Mr. Dodig moments after Mr. Welch refused to call the Estate's premier medical causation witness on rebuttal, *infra*, as he had promised the Estate executor he would do.

19.    After Mr. Welch's $7,223.10, under-the-table transaction took place at lunchtime, Mr. Welch's law clerk, in whistleblower fashion, leaked to the Estate executor word of the unlawful transfer of money that had been done without her knowledge, authorization, or consent. A Vermont Superior Court bailiff warned the Estate executor she would be held in contempt of court should she attempt to speak to the Superior Court vocally on Mr. Welch's unauthorized money exchange with Mr. Dodig before jury deliberation. The Estate executor consequently remained silent, not realizing the implications of such a trial malfunction. The executor was never physically in a position to "ratify" anything. (*See*, Attachment A, Superior Court Hearing Transcript, August 21, 2024, at 17:1-19.)

20.    No such monetary "settlement" of $7,223.10 instrumented by Mr. Welch at trial ever

took place; let alone, ratification of it by the Estate executor. There was no contract as to disbursement of this money and therefore no benefits of a contract. Fraudulent nomenclature on a purported "settlement" at trial permeated proceedings in this Court by Mr. Welch seven years later due to Mr. Decato's breach of agreement with the Estate executor on this matter. The fraud was next parroted in a summary order by the 2nd Circuit because Mr. Decato broke his promise at retainment to set the record straight and expose the $7,223.10 bribe Mr. Welch enacted with defendant Mr. Dodig.

21.    Mr. Decato had promised to expose, at a *Daubert* hearing held in this Court on April 4, 2017, a bait-and-switch representation by Mr. Welch that the Estate executor paid at the end of trial a $7,223.10 "counterclaim" to Mr. Dodig—despite Mr. Welch having memorialized on his retainment that any heretofore, so-called counterclaim was "a sham," *infra.* Mr. Decato contravened all agreements between him and the Estate executor to plead this, and engineered, not a refutation of the false claim, but instead a validation of the fallacious and fraudulent acts of Mr. Welch as to the $7,223.10 bribe between Mr. Welch and Mr. Dodig that ended the case at trial.

22.    Contrary to the intent expressed in a myriad of written materials amassed in preparation for trial in this Court, and against all agreements of his retainment, Mr. Decato permitted on the record fraudulent misrepresentations by Mr. Welch as to other pivotal events at trial in Superior Court and amplified defense-spun extrication of Mr. Welch's perfidious trial conduct.

23.    Mr. Decato thereafter, against all promises to the executor on his retainment, buried evidentiary testimony of the Estate's premier medical causation witness's formal declaration on his expectation to testify at trial, and concealed the fraudulent means by which Mr. Welch in Superior Court kept the Estate's key expert away from the stand, *infra.*

24.    Undersigned has instructed the Estate executor that all actions made in the presence of fraud are *void ab initio*.

25.    Vermont Superior Court Judge Lon McClintock opined at the Estate's Motion Hearing on August 21, 2024:

> It's painful to be deceived and cheated by the very people
> who you – should expect to trust.

(Attachment A, Superior Court Hearing Transcript at 13:18-23.)

The Court further stated:

> And you may – if the gods and planets align, you may hold
> them both legally responsible for how they've done you wrong.

(*Id.* at 22:23-25)

26.    After Mr. Welch had attempted lastly to bribe the Estate executor, the executor retained Nancy J. Waples, Esq. of Hoff Curtis to litigate and appeal the improprieties and fraudulent acts of Mr. Welch. One such act of Mr. Welch ended in forensic document examination findings that Mr. Welch, at trial, had forged the signature of Medical Examiner Benjamin Glick, M.D. The forgery became trial evidence that duped the jury. It was a fraudulent affidavit that worked immeasurably to undermine at trial medical causation in the Estate's case, *infra*, and fraudulently misstated material fact that then impacted upon Vermont Supreme Court's opinion with respect to the case.

27.    Mr. Decato was hired to expose the multiple frauds of Mr. Welch that were perpetrated on the courts and on the Estate, and, after meetings with the Estate executor to review the Estate's evidence of Mr. Welch's fraud, Mr. Decato promised the Estate executor absolute prosecution of the Estate's case. But Mr. Decato inexplicably shifted his prospect and aligned himself with opposing counsel David Cleary, Esq. in an inducement and extortionate proposal to the Estate executor not to litigate the case any further.

Docket # 2:24-cv-1238

28.    Mr. Cleary, while attempting to prevail on Mr. Decato, nevertheless deviated from his stance and, at the same time, informed the Estate executor in a telephonic conference that Mr. Decato had "flouted" this Court's deadline for filing Plaintiff's legal expert opinion among other litigation futilities related to Mr. Decato. Mr. Cleary disclosed that Mr. Decato had been responsible for failures in case proceedings. That information on November 21, 2018 came as a great shock to the Estate executor because, for one full year, Mr. Decato had represented to the executor that he had timely filed all Plaintiff's submissions properly and, most importantly, had obeyed all court orders and requests for submission of evidence. Based on other statements Mr. Cleary had made in parties' *Daubert* hearing that were not true, the Estate executor surmised that Mr. Cleary's remarks had no basis in truth.

29.    Attorney Appellate Services, Inc. on December 24, 2018, and by its proprietor, directed the Estate executor to Public Access to Court Electronic Records (PACER) so that she could find and read U.S. District Court Opinion Document No. 84 that Mr. Decato had concealed from her. Mr. Decato's affirmations to the Estate executor that he had met successive court-ordered deadlines turned out to be untrue and deceitful. Mr. Decato had never, by any means whatsoever, sent to the Estate executor this Court's Opinion No. 84 that would have proved to the executor Mr. Decato did not timely submit his legal expert's opinion but for over one month after this Court had ordered him to do so.

30.    Mr. Decato's deception, cover-up, and dereliction of his fiduciary duty to inform the Estate executor caused her not to be aware of these facts until December 26, 2018. (*See,* Exhibit 2, Estate executor's PACER documentation.)

31.    The U.S. District Court held that Mr. Decato's delinquency to serve and file the Estate's amended legal expert report of Attorney Thomas O'Toole was "inexcusable" and his "noncompliance was willful." (U.S. District Court Opinion No. 84 at 17, ¶ 1)

32.    The Estate executor learned Mr. Decato's deceptive actions caused the case contingently to fold and the Court to decide in Opinion Document No. 88: "As a result, had Plaintiff prevailed in her legal malpractice claim against Defendants [Welch], she would have been able to recover the value of the Estate's claim for Eva Puppolo's bodily harm." Decedent Eva C. Puppolo had first suffered catastrophic bodily harm and, days later, death by fentanyl intoxication at Crescent Manor. (U.S. District Court Opinion No. 88 at 19–20, ¶ 3)

33.    This Court, in addition, ruled:

> It is undisputed that Plaintiff served Attorney O'Toole's August 15, 2016 Opinion over one month after the court-ordered deadline to do so. Plaintiff neither sought leave of court to extend that deadline, nor requested an extension from Defendant … <u>Viewing the relevant factors collectively, the court concludes that Plaintiff's untimely service of Attorney O'Toole's August 15, 2016 Opinion is neither harmless, nor excusable</u>.

(Case 5:14-cv-00095, Opinion Document No. 84 at 18, ¶ 3; 19, ¶ 2) (Emphasis added)

34.    Plaintiffs will prove that fraudulent acts of misrepresentation were committed by the Estate's retained attorney Mr. Decato. When the Estate executor learned about them on December 26, 2018, it became apparent thereafter on the advice of counsel that Mr. Decato had been betraying the contractual promises he made in the fiduciary role he was vested with upon his retainment by the Estate to prosecute the Estate's case against Mr. Welch. Instead, Mr. Decato aided and abetted the frauds committed by Mr. Welch.

## STATEMENT OF FACTS
### I.        FRAUD UPON THE VERMONT COURTS

35.    Mr. Decato, barred in the U.S. District Court for the District of Vermont, represented the Estate of Eva C. Puppolo from August 1, 2015, the date of his contingency agreement, *infra*, to June 20, 2022, when he withdrew his appearance.

36.    On July 12, 2022, Mr. Decato, while acting in a fiduciary capacity and as an officer of the Court in the U.S. District Court for the District of Vermont and in Vermont Superior Court, intentionally, and fraudulently misrepresented to the Superior Court that he could not contact the Estate executor for an urgent court-scheduled hearing on probate accounting.

37.    Though the Estate executor's same phone number that Mr. Decato had always called had never changed, Mr. Decato never once paid a call to her (as verified by Verizon Communications, Inc.) and hence she did not know about the hearing. When she did not appear for the hearing, Mr. Decato's deceptive misrepresentation before Vermont Superior Court Judge Justine Scanlon resulted in discharge of her as executor of the Estate.

38.    On January 31, 2024, after a related probate hearing before Superior Court Judge Lon McClintock, who examined the breadth of matters including Mr. Decato's misrepresentations, reinstated Celeste A. Puppolo as Estate executor on April 18, 2024. (*See,* Exhibit 3, Letters of Administration, reinstated.)

39.    Mr. Decato's fraudulent act before Vermont Superior Court exacted a cost to the Estate executor—grief, that she had to expend more time, money, and energy to right this wrong. In the seven months during and following the Superior Court's decree that her executorship had been revoked, the Estate executor's work *pro se* to produce and serve all Estate beneficiaries with her motions to the Probate Court stacked this stressor upon her

and caused the Estate executor to be under so much stress that she grew an extensively large, observable tumor that burgeoned suddenly and required emergency surgery.

40.    Mr. Decato's scienter, in the wake of his predecessor's infringements and violations upon Plaintiff's constitutional right to due process at trial in Vermont Superior Court, mirrored the fraud by Mr. Welch that Mr. Decato, retained as a trusted fiduciary, had promised to expose and prosecute.

41.    This Complaint lays out actions perpetrated by Mr. Welch that, in the presence of fraud, Mr. Decato accepted and incorporated. The tangled attorney web, woven and veiled by three retained attorneys of the Estate, who relied on fraudulent means to achieve their ends, only "practiced to deceive." Mr. Decato, who made deals with opposing counsel as to what to do and what not to do in this case, knowingly suppressed evidence, while never pleading to this Court a series of fraudulent misrepresentations first spun in Vermont Superior Court by Mr. Welch, that on Mr. Decato's retainment, Mr. Decato promised absolutely to expose and prosecute.

EXEMPLARY AND PUNITIVE DAMAGES

42.    All actions hereto that were made in the presence of fraud are *void ab initio*.

43.    Defendants' initial, seemingly sincere verve and commitment fiduciarily to expose and prosecute Mr. Welch changed. Mr. Decato's fraudulent misrepresentation and actions were likely motivated by allegiance to opposing counsel, self-preservation, and greed.

44.    In this Complaint, the Estate will show a clear-cut case of fraud upon 1) the Vermont court system, 2) the injured parties to the case; 3) the interest of justice; and 4) the functioning of the U.S. District Court and Vermont State Court that allows parties to invoke their constitutional right of due process under the law. Consequently, the above-captioned

Plaintiffs, the Estate, the Estate executor and Celeste A. Puppolo, have never been allowed their due process right to a fair trial.

45.     The revealed and discovered unlawful acts of Mr. Decato and Mr. Welch, characterized on the court record, simply could not have occurred without a callous disregard for the most basic rights of an elderly patient, once at the center of litigation associated with this matter. Cover-up of utterly barbaric acts by Crecent Manor and its medical staff, effectively furthered by one retained attorney after the next, amounts to corruption of the medical system, and spread overall to the legal system. Mr. Decato's dishonest actions only enhanced prior subversion in this case. He acted against the interests of human justice by lying to the courts, as did his predecessor, Mr. Welch. Massive corruption in this case, howsoever accomplished as detailed, *infra*, resulted in subversion of the Vermont court system.

46.     Base trickery by lawyers, who posed as plaintiff advocates to litigate as officers of the court, was denoted and recognized in court actions, fortunately. That it subverted an entire court process must be exposed to request exemplary damages, for all to see and never to forget. The ultimate result of Defendants' deceptive conduct, suppression of the Estate's evidence of forgery, fraudulent concealment, fraudulent inducement, aiding and abetting a fraud, and breach of fiduciary duty when retained to bare frauds upon the court exerts now an equal and greater effect. Defendants' conduct was intentionally designed to down-play pain and suffering, given the inhumane actions causing the decedent's heinous death, and to advance corrupt actions by attorneys by covering them up. According to Vermont Supreme Court's decision written by Justice John A. Dooley, Mr. Welch chose not to bring "potential embarrassment to the doctors and nurses," and therefore did not pursue Crescent Manor's falsified medical records and other case cover-ups, *infra*. (*Puppolo v. Donovan & O'Connor*, LLC, 2011 VT 119, 191 Vt. 535, 35 A.3d 166)

12

47.     The Estate executor relied upon all promises by Mr. Decato and predecessor attorneys, who she had believed were trustworthy officers of the court, but unbeknown to her the executor had retained attorneys who cheated and indulged in political bribery and lawyer thievery.

48.     Upon consultation with Undersigned Counsel, the Estate executor discovered further the underhanded actions, *infra*, of an irrational attorney who was to expose in this Court prior frauds perpetrated upon Vermont Superior Court in the Estate's case matter, but who willfully obstructed the exposure of fraudulent attorney acts, including his own.

49.     This Court was compelled to grant summary judgment by the intricacy of the fraud, the cleverness of the fraud, and the Law that required the Court to rule according to facts as they appeared, no matter how deceptive; "facts" purported by opposing counsel that were intentionally left undisputed by Mr. Decato, *infra*. There can be no judgmental immunity without an honest exercise of professional judgment. (*Woodruff v. Tomlin*, 616 F.2d 924 (6th Cir., 1980); *Roberts v. Chimileski*, 820 A. 2d 995, 2003 VT 10 - Vt: Supreme Court, 2003; *Biomet, Inc. v. Finnegan Henderson*, 967 A. 2d 662 - DC: Court of Appeals, 2009).

50.     The Vermont courts fortunately documented facts in findings and in such a positive manner that the attorney-orchestrated suppression of case material can be revitalized by a proper pleading of fraud upon the Court.

51.     Criminal behavior of members of the bar, all extremely unusual to the extent of being unthinkable, as is Mr. Welch's act of signature forgery, was fraudulently concealed by Mr. Decato. The fraudulent acts of Defendants and their predecessors, without any regard for the norms of our legal system, are described factually and with specificity as required by F.R. Civ. P. 9 (b), as elucidated herein.

## II.     FRAUD UPON THE ESTATE AND ITS EXECUTOR, FRAUD UPON CELESTE A. PUPPOLO, AND WITH ASSOCIATED DAMAGES, EACH WITH SPECIFICITY AND PARTICULARITY

52.    This Complaint herein sets grounds for bringing forth sworn testimony.

53.    Mr. Decato represented to the Court that he was submitting crucial, court-ordered evidence that Judge Christina Reiss of the U.S. District Court for the District of Vermont mandated be filed, and he fraudulently misrepresented to the Estate executor that he had complied with the Court's orders, when he had not.

54.    Mr. Decato sabotaged the Estate's case for reasons only Mr. Decato knows. However, his scienter was inferred by the District Judge in Opinion Document No. 84, *supra*. Plaintiffs when commencing discovery and applying Federal Rule of Civil Procedure 30(b)(6) foresee that deposition of Defendants with subpoenas to witnesses and documents in the custody of Decato Law may elicit admissions for Mr. Decato's breach of contract.

55.    Available evidence demonstrates the following contentions of the Estate:

1) By not following the clear instructions of this Court, Mr. Decato first brought harm to the Estate's case by filing Plaintiff's legal expert report over one month late, after the U.S. District Court liberally gave Mr. Decato a 45-day extension.

2) Mr. Decato flouted his untimely legal expert report filing, *willfully*, as a blatant and incontrovertible act of case sabotage.

3) Inconceivably, Mr. Decato had expressly flouted Plaintiff's court-ordered deadline of July 3, 2016, for submission of Plaintiff's amended legal expert report, and never gave this Court an explanation. His deceptive actions deprived the Court of Plaintiff's determinative, relevant, and pivotal material evidence, thrice produced by the Estate's legal expert.

4) The court-ordered amended legal expert report was backed by strong evidence and included opinion based on the Estate's audio recordings

that Judge Reiss ordered produced for examination by the Court. The audio recordings contained crucial evidentiary information Her Honor repeatedly requested she be able to hear.

5) Mr. Decato's "willful" refusal (U.S. District Opinion Document No. 84 at 17, ¶ 1) to obey court orders and his lying about it to the Estate executor irrevocably caused the case to fail.

6) Apparent and willful case sabotage by retained counsel Mr. Decato was directly contrary to his contract of employment and all jointly planned contracts between Mr. Decato and his client.

56. Mr. Decato fraudulently misrepresented case facts in the following ways:

1) Mr. Decato made false statements to the Estate executor that contained material facts, and his statements were statements of fact.

2) Mr. Decato possessed the knowledge that his statements to the Estate executor and to the Court were untrue and he demonstrated conscious disregard and indifference as to his falsities.

3) Mr. Decato was silent when he had a fiduciary duty to speak.

4) Mr. Decato knew his statements were false because he had received a concrete holding from the U.S. District Court in Opinion No. 84 that belied his statements to the Estate executor as he actively concealed the truth from her. Mr. Decato's non-disclosure to the Estate executor of the Court's dire criticism of him was overtly misleading and a positive misrepresentation of facts. Active concealment of Court Opinion No. 84 by Mr. Decato was an effort consciously made by him, that the executor not know his one-sided knowledge on the true disposition of the Estate's case. Mr. Decato suppressed these facts purposefully.

5) Mr. Decato knew the Vermont federal and state courts and the Estate executor justifiably would rely and did rely on his statements and/or the absence of his statements. For purpose of the Estate's continued litigation and for the materiality of Mr. Decato's misrepresentations to his client, the Estate executor was induced to agree with him, and the executor thereby continued to rely on him. Mr. Decato repeated this pattern of conduct throughout his tenure in the litigation, while his acts, concealed as they were, he repeated circumstantially.

6) Mr. Decato represented the Estate and, yet, unbeknown to his client, he knew his defalcations as documented in U.S. District Opinion 84, and his fraudulent actions, brought financial injury to the Estate.

57.    Mr. Decato willfully concealed from his client Opinion Document No. 84 because it depicted a stain upon him for his manifold wrongdoing. Mr. Decato suppressed from the Estate executor the information the Court had rendered pertaining to his own character, misdeeds, and court-rendered malintent while he defaulted procedurally, all unbeknown to the executor. Mr. Decato's cover-up effectively self-exonerated his misdeeds along with his malintent, a vital element of an allegation of fraud, if a lawyer is representing to his client that he is a true officer of the Court and an honorable member of the Bar.

58.    On December 29, 2017, after Mr. Decato had concealed from the Estate executor rulings by the Court that were contained in Court Opinion Document No. 84, in a protracted act of deception, Mr. Decato wrote to the executor by email and stated, "I think we've worked well together in this case. I think we've done well under all of the circumstances." (*See*, Exhibit 4, Email of Mr. Decato to the Estate executor.)

59.    That Defendants had never sent to the Estate executor the Court's holding by United States Postal Service, by email, or by any other method of transmission, makes plain why Mr. Decato continued consciously to mislead his client in positive representations that had become a pattern of his deceptive behavior. A likely motive for Mr. Decato's deceit in misleading the executor rested in his not having desired to become a defendant himself.

60.    The Estate executor acted in reliance upon Mr. Decato's false representations by implicitly trusting in Mr. Decato's promises moving forward and agreeing with him on case matters as he saw fit.

61.    Mr. Decato promised the Estate executor on her retainment of him a vow to submit all material evidence that would go to punitive damages, and he did not. Mr. Decato's agreement with the Estate executor was to prosecute Mr. Welch for Mr. Welch's having

withdrawn the Estate's claim for punitive damages at trial (as Vermont Superior Court was deprived by Mr. Welch of sufficient evidence the Estate held to support punitive damages); thereby, depriving Plaintiff of its goal for the court to justify an award of punitive damages.

62.    Mr. Decato next acted in the same deceptive manner as Mr. Welch at trial by not submitting material toxicology, hair sample forensics, and audio evidence, *infra,* that would have impeached defense testimony and in turn positively set the stage for Plaintiff to request a claim for punitive damages. [1] Mr. Decato aided and abetted Mr. Welch's concealment and withholding of indispensable case medical evidence at trial that would have warranted punitive damages. Despite contractual promises to the Estate executor, Mr. Decato suppressed supportive and specific evidence that Mr. Welch had mailed a formal letter to the Estate executor stating: "[T]he real goal to be reached is the punitive component at any rate." (*See,* Exhibit 5, Letter, Mr. Welch to the Estate executor.)

63.    Undisputed is that the $7,223.10 check, written by Mr. Welch on the escrow bank account of the Estate, was not only misappropriated from one purpose to another purpose to obstruct continuation of the jury trial, functioned contingently to end any possibility that the Superior Court could grant a request for punitive damages. The last-minute machination by Mr. Welch worked to vitiate the promised appearance by him of Plaintiff's premier medical causation witness at trial who was to testify on direct in the case-in-chief as well as on rebuttal; but, instead of the expert's testimony happening at all, Plaintiff's case then went directly to the Jury. (*See,* Exhibit 6, Vermont Superior Court Trial Verdict Sheet.)

---

[1] Hair sample forensics, a function of the rate of hair growth in the presence of an absorptive drug, would have proved that fentanyl was not embedded along the decedent's hair shaft, that the decedent had no prior exposure or tolerance to the drug fentanyl, and that the overdose of fentanyl administered was undeniably lethal, according to the toxicology fatality range for fentanyl by medical examiners, and also according to the opinion of the Estate's premier causation medical expert witness.

64.     In the abovesaid act, Mr. Welch misappropriated the Estate's money in his escrow trust that was reserved for paying Philip R. Totonelly, M.D., F.A.C.C., F.A.C.F.M., Plaintiff's designated premier medical expert witness on Plaintiff's 26(b)(4), to testify on causation throughout the trial.[2] Dr. Totonelly had opined that (1) Crescent Manor health care providers had breached the standard of care in rendering appropriate and necessary treatment to Eva C. Puppolo for a gaping lumbosacral tear to her spine, and that (2) Crescent Manor health care providers had intentionally overdosed Eva Puppolo with fentanyl in extreme quantities, which caused her death.

65.     Mr. Dodig, merely minutes after he received the Estate's $7,223.10, conceded to legal malpractice for his having run the statute of limitations for both wrongful death and survival in the Estate's case. The Jury was left to deliberate on case medical malpractice claims, immediately after Mr. Welch with opposing counsel had made a simultaneously complicit, shoulder-to-shoulder arrangement for Plaintiff not to call on rebuttal the Estate's qualified clinician expert Dr. Totonelly, who was necessary at trial both for standard of care and cause of death in the lethal maladministration of the drug fentanyl.

66.     Despite having the Estate's case material evidence set and ready for prosecution of Mr. Welch's malfeasance at trial, Mr. Decato let the travesty of Mr. Welch's underhanded acts stand unaddressed throughout Defendants' fiduciary representation of the Estate, and Mr. Decato conducted himself in court without any of the Estate's witnesses and material evidence Mr. Decato had promised the Estate executor on his retainment he would utilize. As Mr. Decato was defaulting on his clear duty both to his client and to the Court, his malintent and misdeeds were all the while unbeknown to the Estate executor.

---

[2]  Dr. Totonelly is a New York physician, board certified in cardiology and internal medicine, and an intensivist clinician in ICU critical care who administered fentanyl on a daily basis.

67.     Memorialized on audiocassette recordings that this Court ordered Mr. Decato to submit, and that Mr. Decato fraudulently misrepresented to the Estate executor had been submitted to this Court (after the executor had given to Defendants her FedEx number to ship the recordings to Judge Reiss), is Mr. Welch in full vociferation stating to the executor:

> 1)  "Dodig's [$7223.10.] counterclaim was a sham."
>
> 2)  The Estate "doesn't owe Dodig anything."
>
> 3)  The Estate "will let the jury decide any counterclaim" and "should never pay it."

Mr. Welch had assured the Estate executor at commencement of trial, as is heard on the audio recordings, as well as documented in Parties' Transcription of Case Audio Files and in other written assertions, that he would expose Mr. Dodig's phantom billing to prove that the Estate was free of all costs. Mr. Decato agreed to submit as evidence these case facts. Mr. Welch had given the Estate executor explicit instructions that Plaintiff should never pay a "counterclaim" that was one of both phantom and block billing. (*See*, <u>Exhibit 7</u>, Parties' Transcription of Case Audio Files.)

68.     Evidence that the Estate executor had never given Mr. Welch permission to release the Estate's trust funds to Mr. Dodig was necessary for Defendants to submit at parties' *Daubert* hearing. Mr. Decato, being in sole control of case material facts at the hearing, chose not to protect the Estate on this level and he never submitted to the Court argument and/or evidentiary proof as to the above. (*Id.*) Though Mr. Decato had represented to the Estate executor that it was not necessary to do so at that time, in retrospect, it was necessary.

69.     Prior to parties' *Daubert* hearing, Mr. Decato caused Count I, Legal Malpractice, of the Estate's Complaint against Mr. Welch ultimately to be stricken. Mr. Decato's refusal to submit case legal expert testimony timely without ever notifying the Court with any reason

as to his defaulting, or to ask for a continuance to file timely Plaintiff's amended legal expert report, brought on dismissal of Count I in the case. Mr. Decato, following a pattern of concealment circumstantially, hid from the Estate executor these resultant facts as tied to his personal defalcations, and did not communicate that, given his "defaulting" and/or complicity with opposing counsel on matters pertaining to timely filing of his legal expert's report, he had provoked the ire of the Court. The noncompliant, willful disregard of Mr. Decato was explicit in this Court's, Opinion Document No. 84, *supra.*

70.    Mr. Decato willfully turned a blind eye and escaped what would have resulted from further inquiry by the Estate executor had he not been deceitful and instead truthful as to the foregoing facts. Further inquiry into matters did not occur due to the Estate executor's steadfast reliance on Mr. Decato, her trust in him, and her fiduciary relationship with him. As is supported by evidence, Mr. Decato intended to deceive the executor for fear she could find out and insist he withdraw from the case.

71.    Defendants, on retainment and by contractual promise to the Estate executor to right the wrongs of Mr. Welch and never to withhold evidence from this Court as Mr. Welch had at trial in Superior Court, instead furtively aided the guiles and overt inaction of Mr. Welch.

72.    Of Eva Puppolo's death, Mr. Welch had described the Estate's case as "something between a mercy killing, and [] a grossly negligent homicide." As stated in Mr. Welch's correspondence with the Estate executor, and captured in case audio recordings, Mr. Welch had advanced his fiduciary opinion: "You've got a 5-million dollar claim out there." (*Id.*)

73.    Mr. Welch's fraudulent acts are *void ab initio* because they were rendered at trial before Vermont Superior Court by untruthful and dishonest means. The Estate legal expert

Thomas O'Toole's testimony on the misuse of aforesaid underlying case material evidence

this Court iterated in Opinion No. 84:

> In a legal malpractice action, a plaintiff must prove that the attorney was
> in fact negligent and that this negligence was the proximate cause of the
> plaintiff's injury. (See, Fleming v. Nicholson, 168 Vt. 495, 497, 724 A.2d
> 1026, 1028 (1998)). In a legal malpractice action, the required standard
> of conduct is the exercise of professional care and skill. Hamilton v.
> Sommers, 2014 S.D. 76, ,-r 1, 855 N.W.2d 855, 858. Vermont appears
> to recognize the doctrine of judgmental immunity. Roberts v. Chimileski,
> 2003 VT 10, 175 Vt. 480, 820 A.2d 995. Under the doctrine of judgmental
> immunity, an attorney is not liable for acts and omissions in the conduct of
> litigation which are based on an honest exercise of professional judgment.

> It is my opinion, held to a reasonable degree of legal probability, that Mr.
> Welch departed from the standard of skill and care held out for the legal
> profession in the State of Vermont. In my opinion Mr. Welch has not
> exercised the professional care and skill expected of a Vermont attorney
> litigating a case where the main goal is to obtain punitive damages. It is
> further my opinion that Mr. Welch isn't or shouldn't be protected by the
> judgmental immunity doctrine as the evidence supports that Mr. Welch
> didn't act in good faith and upon an informed judgment after undertaking
> reasonable research of the relevant princip[le ]s and facts of the
> given case. See, e.g., Smith v. Lewis, 13 Cal. 3d 349, 530 P.2d 589, 595,
> 118 Cal. Rptr. 621 (Cal. 1975).

> Even though Mr. Welch intended to seek punitive damages, he testified
> that he wasn't familiar with Pion v. Bean, 2003 VT 79, 176 Vt. 1, 833 A.2d
> 1248. However, he conceded that Pion accurately described the law in the
> State of Vermont as it existed in 2010. Pion says that punitive damages are
> appropriate where there has been a showing of actual malice or a showing
> of conduct manifesting personal ill will or conduct carried out under
> circumstances evidencing insult or oppression, or even by conduct showing
> a reckless or wanton disregard of one's rights will suffice.

> In his deposition, Mr. Welch indicated that the basis of the wrongful death
> action would have been related to administering too much fentanyl and
> that he intended to get punitive damages by showing reckless and wanton
> behavior. If getting punitive damages was Mr. Welch's goal, he failed to
> pursue and utilize the available evidence to establish malice or reckless
> and wanton behavior.

> I mentioned the evidence Mr. Welch ignored in my earlier opinion(s):

> Mr. Welch failed to call as an expert Philip Totonelly, M.D., especially as
> it pertains to the standard of care relating to the dosing of fentanyl in treating
> Ms. Puppolo; failed to call witnesses with material information, such as

Brianne DiMaggio; failed to present evidence demonstrating that the increase in the size of the ulcer was due to a tear; failed to challenge the medical testimony of defendants' expert with available scientific information, e.g., *Disposition of Toxic Drugs and Chemicals in Man*, which was known by and discussed with Mr. Welch; failed to present evidence of the alteration by the medical providers of certain medical records; and elicited testimony from defendant Christopher Dodig regarding the merits of the underlying medical malpractice case. …

The evidence I've seen suggests that Mr. Welch made promises to try the claim against Attorney Dodig a certain way and then Mr. Welch reneged on the promises. He agreed at one time to call Dr. Totonelly, Brianne DiMaggio and some of the other nurses, but didn't. He agreed at one time to use the report from Joan McCann about the altered medical records and didn't. In my opinion, the refusal to use this and the other evidence shows poor judgment and lack of good faith.

… Mr. Welch's judgments were not the honest exercise of professional judgment.

(Case 5:14-cv-00095, Opinion Document No. 84 at 9–12)

74.    Mr. Welch, having stood before the Vermont Superior Court, lied on the record at pretrial to Judge David Suntag regarding Mr. Welch's attempts to contact Dr. Totonelly for trial. Mr. Welch perpetrated a fraud upon the Vermont Superior Court when he twisted the facts and precluded Plaintiff's calling Dr. Totonelly. Mr. Welch stated he could not at all reach Dr. Totonelly and was left to "recruit" Medical Examiner Benjamin Glick, M.D. in Dr. Totonelly's stead. This was explicitly untrue, let alone alarming, as any preference of Dr. Glick over Dr. Totonelly belied the need at trial for Plaintiff to have the testimony of a <u>clinician medical expert witness</u>. Lack of a qualified clinician medical expert would prove fatal to the Plaintiff's case. Mr. Welch deceitfully manipulated all facts as pertained to contacting Dr. Totonelly when Mr. Welch suddenly lied to the trial court as to the truth and order of events respecting the same. Mr. Welch never had to recruit or "retain" Dr. Glick because Dr. Glick was already hired by the Estate to autopsy Eva Puppolo three days after Eva's death. Mr. Welch addressed the court at pretrial with emboldened false facts and bad faith actions. (*See*, <u>Exhibit 8</u>, Affidavit of Philip R. Totonelly, M.D., F.A.C.C., F.A.C.F.M.)

75.    Mr. Welch's bad faith actions should be treated by the court system and jury as circumstantial evidence of intent to destroy the legal position of his own client.

76.    The intricacy and cleverness of Mr. Welch's initial fraud upon Vermont Superior Court caused acceptance and adoption of what unfortunately became opinion in *Puppolo v. Donovan & O'Connor*, LLC, 2011 VT 119, 191 Vt. 535, 35 A.3d166. Passages such as this are categorically untrue as written by Vermont Supreme Court of Mr. Welch's actions in Vermont Superior Court:

> Nor, the court explained, did the attorney "ignore Plaintiff's request to retain a specific medical expert." Rather, he attempted to contact that expert, but did not receive a response. He therefore retained another experienced expert whose opinion did not differ from that of Plaintiff's preferred expert.

(*Puppolo v. Donovan & O'Connor*, LLC, 2011 VT 119, 191 Vt. 535, 35 A.3d 166)

77.    Mr. O'Toole opined that it was egregious Mr. Welch, in open court, lied to Judge Suntag about purported attempts by him to contact Dr. Totonelly. (Exhibit 8) Mr. O'Toole stated it was unreasonable as well as impossible of Mr. Welch to have succeeded at trial while utilizing for standard of care a medical examiner who hadn't treated a patient in over three decades, and perfidious of Mr. Welch to have falsely represented case facts to Superior Court Judge Suntag. Mr. Welch's double-edged scheme doomed both Estate medical expert witnesses from testifying and precipitated the trial's end. Dr. Totonelly was prevented from testifying and Dr. Glick was not allowed to opine on clinical standard of care, neither with respect to the lumbosacral tear inflicted upon Eva Puppolo, nor to the maladministration of fentanyl that caused Eva's death.

78.    Mr. Decato submitted none of the Estate's case evidence thereon after to prove that Dr. Glick had been serving the Estate solely as pathologist and medical examiner dating back seven years. Dr. Glick was designated on the Estate's original 26 (b)(4) statement

alongside Dr. Totonelly, and never did Mr. Welch then have to recruit or retain Dr. Glick, as was falsely characterized by Mr. Welch in his fraudulent misrepresentation before Vermont Superior Court.

79.    Dr. Totonelly attested in his affidavit that Mr. Welch never once called him for trial. Mr. O'Toole testified that it was *unreasonable* of Mr. Welch to have employed at trial for standard of care a medical examiner who hadn't treated a patient in over three decades, and *duplicitous* of Mr. Welch to have falsely represented case material facts to Judge Suntag. This Court cited Mr. O'Toole's expert testimony on the aforesaid issue in Opinion No. 84:

> I am concerned by the fact that Mr. Welch represented to the trial court that he chose not to use Dr. Totonelly because he attempted to contact him on a plurality of occasions and was unable to reach him. I called Dr. Totonelly and had no trouble reaching him. When I did reach Dr. Totonelly, he indicated that Mr. Welch had never tried to contact him. Mr. Welch testified that he could understand why Celeste Puppolo believed he was going to call Dr. Totonelly and that he recalls promising to call Dr. Totonelly as a rebuttal witness.
>
> In his deposition, Mr. Welch admitted to knowing of Dr. Totonelly and he knew that Dr. Totonelly had strong opinions. Mr. Welch knew that Dr. Totonelly had the opinion that the Crescent Manor health care providers had negligently or intentionally overdosed Eva Puppolo with fentanyl in extreme quantities which caused her death. This is very strong evidence establishing negligence, especially considering that there was a claim for punitive damages.
>
> Mr. Welch admitted in his deposition that he had initially planned on using Dr. Totonelly as a witness. Dr. Totonelly was listed as an expert witness in the 26(b)(4) disclosures. I have reviewed Dr. Totonelly's written opinion, and there is nothing in Dr. Totonelly's written opinion that should give pause to any reasonable attorney trying to establish negligence and get punitive damages.
>
> … In my opinion, Dr. Totonelly's vastly superior clinical background mandated that he be utilized in the Estate's case in chief to establish negligence and get beyond a motion for a directed verdict on the issue of punitive damages. Ultimately, Judge Suntag set aside the request for punitive damages. In

> my opinion, if Mr. Welch had called Dr. Totonelly to testify in
> the Estate's case in chief, Judge Suntag would have decided
> otherwise.

(Case 5:14-cv-00095, Document 84 at 10–11)

80.    The Estate had retained Dr. Totonelly after Eva Puppolo's death to evaluate Eva's

clinical and toxicologic findings. Dr. Totonelly, board certified in internal medicine and

cardiology, also came to the Estate's case with a strong medical background in forensic

toxicology and medical fellowship within both the American College of Forensic Medicine

and the American College of Forensic Examiners. (*See*, <u>Exhibit 9</u>, Curriculum Vitae of

Philip R. Totonelly, M.D., F.A.C.C., F.A.C.F.M.)

81.    There was no question that Dr. Totonelly was the Plaintiff's designated medical

expert witness for causation. This Court cited from an affidavit of the Estate executor

wherein the executor documented Dr. Totonelly's medical expert opinion after the doctor

finally received case toxicology results that Mr. Dodig had never previously provided him.

Dr. Totonelly documented in Plaintiff Estate's 26(b)(4):

> I then informed Celeste as follows: I am extremely bothered
> by the levels of drug found and firmly believe that, even on a
> compassionate basis, no such dosage would be administered
> – not even to a dying patient, unless either by negligent action
> or intentional administration to bring about certain death.

(Case 5:14-cv-00095, Document 88 at 6, ¶ 7)

82.    Mr. O'Toole assiduously studied the Estate's case from September 17, 2012 to one

year after the *Daubert* hearing took place in federal court on April 4, 2017. Mr. O'Toole

never acknowledged he performed "none" of the legal research as was falsely characterized

by Mr. Decato's opposing counsel Mr. Cleary who also inserted into the record a falsity

regarding Mr. O'Toole's legal expert opinion and report of August 15, 2016, *infra*.

(*Daubert* Hearing Transcript, April 4, 2017, at 158:20–161:24)

83.    When Mr. O'Toole was hired to serve as legal expert in this matter, he sent an email, dated June 16, 2015, to the Estate executor and to Mr. Decato. Mr. O'Toole provided his legal research references and Vermont case law citations he had personally documented, and that Mr. Decato later used in a response to a defense motion filed by Mr. Decato. (*See,* Exhibit 10, Mr. O'Toole's personal legal research.)

84.    Mr. O'Toole's legal research and evidentiary case material was thereafter marked for use at parties' *Daubert* hearing. On April 4, 2017, Mr. O'Toole arrived to the *Daubert* hearing physically prepared with volumes of evidentiary material and scientific data along with supportive Vermont case law in preparation for Plaintiff to document case legal and scientific methodologies.

85.    However, when Mr. Decato had received Mr. O'Toole's private emails that contained Mr. O'Toole's legal research information, Mr. Decato forwarded their email correspondence to Mr. Welch's defense lawyer, Mr. Cleary. Mr. Decato also knowingly supplied Mr. Cleary by email with a Memorandum titled "Attorney Welch's Duties" that Mr. Decato had written to Mr. O'Toole.  The email cited *Fly Fish Vermont, Inc. v. Chapin Hill Estates, Inc.*, 996 A.2d 1167, 2010 VT 33 (Vt. 2010), Vermont case law in relation to punitive damages. At parties' *Daubert* hearing, Mr. Decato did not object when Mr. Cleary outright challenged the validity of Mr. O'Toole's personal, professional legal research shared with opposing counsel by Mr. Decato. Mr. Cleary argued that Mr. O'Toole had not performed his own legal research. By not objecting, Mr. Decato then omitted and suppressed the truth that Mr. O'Toole personally had done his own legal research on the case law aptly fit for Mr. O'Toole's carrying his expert work forward. Mr. Decato sat back without objecting at the hearing, as Plaintiff's necessary punitive damages argument consequently went no further.  (*See,* Exhibit 11, Email to Mr. O'Toole from Mr. Decato.)

86.     The defense tactic of Mr. Cleary remained clear of argument by Mr. Decato and left

Plaintiff entirely devoid of any support safeguarding Mr. O'Toole's well-founded position

that he, Mr. O'Toole, had indeed personally performed his own legal expert research. It is

true Mr. Decato had shared with Mr. O'Toole altogether three citations in Vermont case

law regarding judgmental immunity and punitive damages. However, if Mr. Decato had

not, in collaboration with Mr. Cleary, set up Mr. O'Toole by requesting that Mr. O'Toole

review Mr. Decato's legal research, thereby making it appear that Mr. O'Toole did none of

his own, then why relegate their private communication to Mr. Cleary? One must ask how

any expected collaboration between lawyer and legal expert could possibly have

invalidated Mr. O'Toole's expert testimony or have made Mr. O'Toole's own personal and

professional legal research unreliable or unuseful. A guilefully constructed interrogation in

a *Daubert* hearing then theatrically and detrimentally put untrue material facts regarding

Mr. O'Toole and his professional legal research on display and at issue.

87.     Notwithstanding, this Court iterated in Document No. 84 the solid legal expert

testimony of Mr. O'Toole from Mr. O'Toole's August 15, 2016 amended expert opinion:

> In my opinion, Brianne DiMaggio and some of her fellow nurses
> should have been called to testify. Mr. Welch was aware that Brianne
> told the Bennington Police she thought someone at Crescent Manor
> had intentionally given an overdose of fentanyl to bring about Eva
> Puppolo's death. Ms. DiMaggio indicated she had provided care for
> Eva Puppolo and she was of the following belief: (1) Crescent
> Manor had killed Eva Puppolo; (2) Crescent Manor tore Eva's
> coccyx with a bedpan and failed to take care of the tear on Eva's
> backside; and (3) Crescent Manor had "redone" Eva's medical
> records immediately after Eva's death. This evidence goes directly
> to punitive damages, and it was ignored. Ignoring this evidence
> shows, in my opinion, a lack of professional care and skill. …
>
> Mr. Welch's judgments were not the honest exercise of professional
> judgment.

> In my opinion, Mr. Welch's failure to use available evidence and his broken promises to his client constitute a breach of Mr. Welch's duties to use professional skill and care. It is also my opinion, based upon a reasonable degree of legal probability, that but for Mr. Welch's failures, a jury would more likely than not have returned a verdict for the Estate and have awarded general <u>and</u> punitive damages. I believe Mr. Welch's breach of the standard of care was the proximate cause of the Estate's failure to succeed … with Judge Sontag and the jury.

> A solemn relationship of trust and confidence exists between an attorney and his client. It was violated in this case. The failure of Mr. Welch to call Dr. Totonelly; to deal credibly with Dr. Glick; to call Brianne DiMaggio and many of the other nurses; and to use evidence of altered medical records all caused the Estate to lose its case and lose its claims of negligence and for punitive damages … In light of his obligations and representations to the client and the trial court, Mr. Welch failed to act reasonably. Therefore, it is my opinion, held to a reasonable legal probability, that Mr. Welch committed legal malpractice and caused the Estate harm.

(Case 5:14-cv-00095, Opinion Document No. 84 at 11–13)

88.    On retainment of Mr. Decato, the Estate executor had presented to Decato Law evidentiary email exchanges and audio recordings that revealed Mr. Welch had been busy making a deal with opposing counsel before trial for Plaintiff not to call Dr. Totonelly to testify at trial and, at the same time, to undermine Dr. Glick's testimony, *infra*.

89.    The Estate executor had fully trusted Mr. Welch also, but the executor could not understand when Mr. Welch began communicating with opposing counsel as to usage of Dr. Glick singularly at trial; however, still with the promise to call Dr. Totonelly on rebuttal. Mr. O'Toole testified that there was "an element of deceit that there were commitments made to the client. One was, 'I'll call Dr. Totonelly,' and then when he didn't call him in the case-in-chief, he told the client he was going to call him on rebuttal. Well, there was no way he could call him on rebuttal because he had already told the – Mr. Ekman that was not going to call him." (*Daubert* Hearing Transcript at 48:1-7)

90.    Events became clearer to the Estate executor when after Mr. Welch suddenly reneged as to his calling Dr. Totonelly in Plaintiff's case-in-chief at trial, he revoked his promise to call Dr. Totonelly as a rebuttal witness. Simultaneously, mid-trial, Mr. Welch implemented redaction of Plaintiff's forensic toxicology results on Eva Puppolo's death as a fentanyl fatality. Mr. Decato, at parties' *Daubert* hearing, then permitted Mr. Welch's factual redaction of the Estate's forensic toxicology analysis to endure yet again.

91.    Dr. Totonelly prepared himself for *Daubert* testimony with case forensics on Eva Puppolo's death as a fentanyl fatality. Mr. Decato, however, never called Dr. Totonelly to the hearing as promised on Mr. Decato's retainment. On January 3, 2017, Dr. Totonelly had sent by strict chain-of-custody to Decato Law Office an affidavit sworn by Dr. Totonelly that contained evidentiary material legal facts as well as his medical opinion. (Exhibit 8.)

92.    As Dr. Totonelly's qualified *clinician* medical expert opinion was indispensable for Plaintiff to prevail on the Estate's underlying medical case, Mr. Decato promised on Decato Law's retainment that he would expose and prosecute the most flagrant of Mr. Welch's frauds, Mr. Welch's signature forgery perpetrated by him upon both the Superior Court and the Estate. The forgery fatally undermined any possibility of, at very least, toxicological causation at trial. Mr. Welch's signature forgery of Dr. Glick, which this Complaint details, *infra,* was to be demonstrated at parties' *Daubert* hearing by Mr. Decato in lieu of prior suppression of material evidence by Mr. Welch, and, concomitantly, Mr. Decato was to admit into evidence Plaintiff's longstanding forensic toxicology evidence. (*See*, Exhibit 12, National Medical Services toxicology results and fentanyl fatality ranges from medical examiners' authority, *Disposition of Toxic Drugs and Chemical In Man*.)

93.    Mr. Welch, on the eve of trial, had motioned Vermont Superior Court that the Estate's pathologist and medical examiner expert witness Dr. Glick had momentarily "changed" the scope of his testimony in an *unsigned affidavit.* Hours later at trial, the

unsigned affidavit appeared signed by "Benjamin Glick, MD." However, Dr. Glick, in an *In Camera* hearing, categorically denied ever writing and signing the "unsigned affidavit" admitted at trial, and forensic document examination of Dr. Glick's purported signature found that the signature had been falsified. Mr. Welch's constructed affidavit and forgery thereof served at trial to make Dr. Glick's medical expert opinion on Eva Puppolo's fentanyl lethality merely contributory and no longer the sole cause of death.

94.    Pretrial filings of Mr. Welch contained a blue-penciled motion accompanied by his constructed unsigned affidavit, that at trial turned up "signed."  (*See,* Exhibit 13, Pretrial Motion of Mr. Welch, with his Unsigned Affidavit and Affidavit "signed" for use at trial.)

95.    When Dr. Glick testified *In Camera*, he stated, "Well, I didn't sign it so my answer is going to be no." Dr. Glick further testified at trial, "I did not sign this and was very unhappy with it."  Judge Suntag, presiding, immediately intervened: "… I don't know it's correct to keep saying that he changed his Affidavit since he never wrote it; right?  Or signed it?" Of Eva Puppolo, Dr. Glick nonetheless stated: "I thought that she had – still had a – fatal overdose of Fentanyl." (*See,* Exhibit 14, Email from Mr. O'Toole to the Estate executor containing Vermont Superior Court's *In Camera* Hearing Transcript at 38–45.)

96.    Mr. Welch lied to the Estate executor in an email pretrial when he told a concocted story as to why Dr. Glick "was required to revise his opinion." Mr. Welch's representations *In Camera* were then exposed as a gross fabrication, with facts antithetical to what was testified *In Camera* by Dr. Glick. (*See,* Exhibit 15, Email, Mr. Welch to the Estate executor.)

97.    After the trial in Superior Court, legal expert Mr. O'Toole initiated investigatory analysis as to Mr. Welch's fraud upon the court.  Mr. O'Toole contacted attorney peers in the State of Vermont and specifically legal malpractice Attorney James A. Dumont who steadfastly advised Mr. O'Toole to retain a forensic document examiner to analyze the penned signature in controversy on Mr. Welch's unsigned-to-signed affidavit.

98.    Forensic Document Examiners, Inc. of Baltimore, Maryland determined the signature of Benjamin Glick, M.D. not to be genuine.  (*See,* Exhibit 16, ForDoc analysis.)

99.    As the result of Mr. Welch's forgery that irrevocably eroded medical causation in the Estate's case, along with Mr. Welch's abovesaid breaches in the legal standard of care and his refusal to submit the Estate's material evidence that would likely have brought punitive damages, the Jury, in less than one-half hour, found against the Plaintiff. Due to Mr. Welch's machinations, the Estate was unable to support its claims to prove that Eva Puppolo's medical treatment was a blatant aberration of care, if not a criminal act perpetrated by Crescent Manor and its contracted physician employees, one of whom wrote the order for a massive dose of fentanyl.

100.    Mr. Welch abruptly disregarded at trial the Estate's evidence that Crescent Manor falsified Eva Puppolo's medical records according to Crescent Manor nurse testimony and the Estate's additional forensic document examination results. This crime of medical records "doctoring" is chronologized also, *infra*.  The Estate suffered irreparable damage to its case due to Mr. Welch's host of fraudulent acts in Vermont Superior Court, and then ultimately Mr. Decato followed suit.

101.    Mr. Decato submitted none of the Estate's evidence at parties' *Daubert* hearing that exposed Mr. Welch's multiple frauds upon Vermont Superior Court as was agreed to by Mr. Decato on retainment. Mr. Decato had promised to prove that Dr. Glick had been serving the case solely as pathologist and medical examiner dating back seven years and was never designated as Plaintiff's qualified medical expert at trial for clinical medicine. Mr. Decato reneged on employing the Estate's evidence to prove precisely how Dr. Glick was called in on the state of Eva Puppolo's body independent of Eva's family, and, in keeping, how Dr. Glick was hired as a case expert first, his never having been recruited by Mr. Welch to replace Dr. Totonelly.

102.    As predecessor to Mr. Decato in time and deed, Mr. Welch omitted at trial the Estate's most crucial witnesses and all material evidence that would have gone to punitive damages, despite Mr. Welch's original intentions and disclosures. Mr. Decato then promised the Estate executor on retainment that he would prosecute Mr. Welch for his many misdeeds and submit Plaintiff's evidence that was recklessly disregarded by Mr. Welch. Mr. Decato's turning away from all that he had promised presents a circumstantial pattern, highly reminiscent of Mr. Welch's frauds, for which no one can find an innocuous explanation.

103.    The Estate executor, having implicitly trusted and relied on Mr. Decato, finally saw how the case was dismissed. Both the Estate and the Estate executor suffered compounded pecuniary losses flowing from Defendants' many false inducements.

104.    Not before February 20, 2017 had it become known to Plaintiff that a *Daubert* hearing was requested by opposing counsel. The devaluation of legal expert Mr. O'Toole's standing, beginning with Mr. Decato's utter defiance of this Court's order to submit timely Mr. O'Toole's amended expert report of August 15, 2016, proved contingently fatal to the Estate's case. Mr. O'Toole's time-honored case service was precluded from continuation after Mr. Decato submitted to the Court, over one month late, Mr. O'Toole's amended expert report from the filing extension that the Court had liberally granted Plaintiff.

105.    The U.S. District Court thereafter granted Mr. Welch's Motion for Summary Judgment on the grounds that Mr. Decato had not met the applicable standard of care to prove professional negligence of Mr. Welch. The Court opined that Mr. Decato did not show how Mr. Welch's conduct departed from the standard of care, how the standard had been breached, and how Mr. Welch's breach was the proximate cause of harm to the Estate.

106.    Mr. Decato, all the while concealing his own deceit from his client, appealed this Court's decision, and, at the start, the Estate executor remained faithful, tricked, and still unsuspecting. Mr. Decato again concealed evidence that previously would have allowed the Estate to prevail and did so obviously to finalize the case and preclude further reconsideration.

107.    Appealing the case to protect his own skin, Mr. Decato disregarded further options for his client, such as the Estate's ability to pursue Federal Rule of Civil Procedure 59(e), specifically designed to allow reconsideration which, among other relief, in the presence of such egregious attorney actions, might have allowed the Estate consideration pertaining to Mr. Welch's misconduct and dereliction of fiduciary duty given such matters as fraud and fraud upon the court itself.

108.    A Summary Order, however, affirmed the Court's grant of summary judgment (*Puppolo v. Welch*, Case 18-2601, Document 70-1), because the higher court remained oblivious to the above-stated frauds upon the Vermont courts as Mr. Decato covered up the fraud of his fellow attorneys.

109.    Mr. Decato's appeal of U.S. District Court Case No. 5:14-cv-00095 to the 2nd Circuit was done in the presence fraud and was adversely affected in its essence by the frauds that were perpetrated in the Vermont Superior Court up to the Vermont Supreme Court. Most critical to the Estate's loss at trial were the following two most flagrant case determinative acts of fraud:

> a.  The unsigned affidavit that Mr. Welch constructed and then perpetrated as a signature forgery upon the Court by signing the false affidavit himself in the name of the only medical expert Mr. Welch allowed the Estate to have left for trial, Benjamin Glick, M.D.

b. The preemptive act of Mr. Welch, that he committed before his signature forgery, wherein Mr. Welch lied to Vermont Superior Court as to why Plaintiff's premier causation witness for clinical medicine, Philip R. Totonelly, M.D., F.A.C.C., F.A.C.F.M., on Plaintiff's 26(b)(4), would not be appearing to testify at trial.

The fatal effect Mr. Welch's forgery had on the case was that it intentionally undermined medical causation, as the forgery was a reversal of Dr. Glick's 7-year, staunch toxicological testimony. Dr. Glick and Dr. Totonelly together were on Mr. Welch's original 26(b)(4), after which Dr. Totonelly alone was named as medical expert on Mr. Welch's amended 26(b)(4). According to Mr. Welch's second 26(b)(4), Dr. Totonelly was designated to testify as to "massive overdosing of Fentanyl." (*See,* Exhibit 17, Mr. Welch's amended 26(b)(4).)

110.    Mr. Decato had aptly characterized in an early motion, proximal to the time of his retainment, the "unsigned affidavit that Dr. Glick later disavowed," and had rightfully pled: "Mr. Welch undermined the case when he undercut Dr. Glick with an unsigned affidavit. … "There was an unsigned affidavit that Dr. Glick later disavowed." But one full year after Mr. Decato had appealed the case, he unabashedly communicated to the Estate executor that Mr. Cleary had asked him not to use in Plaintiff's case the Estate's forensic document examination evidence of Mr. Welch's forgery. Admittedly, Mr. Decato was complicit in obstructing the Estate's evidence, suppressing and therefore perpetuating Mr. Welch's frauds upon the Superior Court.

### III.    FRAUD AS IT PERMEATED THE ESTATE'S UNDERLYING LEGAL MALPRACTICE MATTER

111.    Incorporated by this reference are the specifics of underlying case legal malpractice matters that grew to be enshrouded in fraud as the Estate pursued its litigation.

34

112.    Due to what appeared to be competing financial interests of parties and attorney representatives in this case, the *in fact* horrendous medical matter lying beneath this action became largely overshadowed in legal significance by skillful, dishonest, and corrupt manipulations of the Estate's hired counsel of record.

113.    None of the true facts relevant to occurrences in the legal processing of this case during trial was fairly and truthfully presented to the presiding Superior Court, and all frauds upon the court resulted in a massive miscarriage of justice.

114.    The trial court found itself in an untenable position as it attempted to sort out by the *In Camera* hearing one paramount problem; namely, those legal machinations brought to the floor by Mr. Welch that otherwise would have required an honest presentation of detail by the Estate's retained attorney. The trial court, determined to solve *In Camera* exactly what had happened circumstantially with respect to Dr. Glick's testimony, arrived at truthful answers. But notwithstanding, after the *In Camera* hearing's extraordinary revelation that Dr. Glick did not write or sign Mr. Welch's manufactured unsigned affidavit, Plaintiff's dishonest counsel made exactly the required legal move to short-circuit the trial court's recovery effect by forging the affidavit. The U.S. District Court documented its sound understanding of the issues, despite Mr. Decato's willful disregard and unwillingness to expose the underlying attorney corruption.

115.    Fortunately, the Vermont courts' judges at best published correct iteration of the Estate's truthful material facts as stated in court proceedings and decisions.

116.    Nevertheless, in both state and federal court, the Estate's offending manipulative counsel together with the opposition endeavored to affect the appellate process with

fraudulent intent to deceive, and ultimately created false appeals thereby to ensure that no normal, fair, and honest appellate process could occur.

117.    Damage has been done to the legal interests of the Estate under Vermont law and to all severely situated persons who probated the estate and suffered abuse by those fiduciaries retained by the Estate to attain justice for the bodily harm perpetrated on the decedent known to this case, Eva C. Puppolo.

118.    The attached Summary cites for purpose of human interest the heinous circumstances under which Eva Puppolo met her death, the fraud by medical providers concealed at trial, and the fraudulent actions of attorneys as the case developed. (*See*, Exhibit 18, Summary: The Underlying Medical Case of Eva C. Puppolo, The Trial That Ensued, With Fraud Brought Upon Vermont Superior Court. *See, also*, Summary, Attachment 19, Email of Mr. Welch to the Estate executor, on the eve of the Estate's trial, wherein Mr. Welch fraudulently announced for the first time that Dr. Glick "had changed" his 7-year medical opinion.)

119.    Before the Estate executor knew that Mr. Welch had forged the signature of Benjamin Glick, M.D. on Mr. Welch's unsigned affidavit falsely devised and sworn, this Court cited the Estate executor's testimony of case facts as the Court recognized that her "affidavit appears to be the most comprehensive articulation of the facts Plaintiff contends support her claims." (Case 5:14-cv-00095, Opinion Document No. 88 at 9, ¶ 1)

120.    In Opinion Document No. 88, the Court cited specific material from the Estate executor's Affidavit that documented the segment of time over which the executor was led inexorably down a winding, fallacious track by Mr. Welch and where a dialog with him,

pinpointed by this Court, became a precursor for her discovery of the persona of Mr. Welch,

*falsus in uno, falsus in omnibus*. The Court opined:

> In her affidavit, Plaintiff avers Defendants made the following promises to her in the course of Defendant Welch's representation of the Estate in the Dodig malpractice action:

Calling Ms. DiMaggio as a Witness

> 39.   Mr. Welch promised, right up until and during the trial in the case he was formulating, to call Ms. DiMaggio as a witness, but he failed to do so; in fact, I found out that he had never subpoenaed her. Mr. Welch also promised to use the Bennington Police report at trial to show the reckless disregard and ill will of Crescent Manor medical staff, but he failed to do so. I had been relying on him to do this, but he reneged after mediation on November 16, 2009. Though, later, Mr. Welch again changed his mind when he revoked a motion in limine that he had filed.

* * *

> 60.   Mr. Welch nonetheless had communicated to me during the trial that he would still call Brianne DiMaggio, L.N.A. to testify "on rebuttal" that Crescent Manor Care Centers had hired a company individual for the express purpose of altering my aunt's medical records. As aforestated, Ms. DiMaggio had previously reported her findings to Mr. Dodig, all the evidence and information of which, by virtue of an audio recording that she made of her testimony, she, through me, relegated knowingly to Mr. Welch. Mr. Welch promised at that time to use the evidence of the "doctored" documents at trial as proof of fraud in the Crescent Manor Care Centers medical record and advised me to acquire a report from the McCann firm, responsible to analyze the way my aunt's Nurses' Care Plan in the medical record had been changed.

(Doc. 43-2 at 8-9, 22.)

Forensic Hair Samples

> 40.   The Vermont Medical Examiner had requested of me that hair samples of my aunt be taken in order to establish forensically and confirm all indication in the medical record that she had no tolerance to opioid drugs. I complied, since the M.E. instructed that this would be good adjunct information to have should the Estate bring legal action against Crescent Manor and its doctors. Mr. Welch promised to utilize the Estate's hair sample toxicology

and then reneged at a time, unfortunately, that this assay became, not merely confirmatory, but indispensable for prevailing at trial.

*Id.* at 9.

42.    On the stand, Dr. Glick, who, as medical examiner, has always been a part of the case, testified that fentanyl was 80 to 200 times the potency of morphine and that my aunt bore the weight of a child on February 25, 2003. Therefore, he opined that the correct measure to be used to determine fatality levels was his Medical Examiner's forensic authority, *Disposition [o]f Toxic Drugs [a]nd Chemicals in Man* (DTDCM), that normatively documents the range of lethal fentanyl levels in liver tissue being 5.9 to 78 ng/g. My aunt's forensic toxicology results fell in the fatality range for fentanyl at 25.0 ng/g, according to the Vermont Medical Examiner's toxicology result, and 36.0 ng/g, according to corroborative forensic toxicology results by the National Medical Services Laboratories, the nation's "specialist lab in postmortem toxicology problems," as named by the Vermont Medical Examiner.

Plaintiff further avers that despite his "affirmations and assurances[,]" Defendant Welch "refused to present for Dr. Glick's testimony at trial Dr. Glick's 'red' Medical Examiner's forensic authority, *Disposition [o]f Toxic Drugs [a]nd Chemicals In Man*, from which to have our expert cite the established lethal forensic data for fentanyl." *Id.* at 11, ¶ 44. … Plaintiff states that "Mr. Welch had promised me that he would share my scientific information [the complete study for two of three forensic toxicology abstracts] with Dr. Glick, then to be advanced at trial, but he did not." *Id.* at 22, ¶ 58.

Dr. Totonelly as Witness

Plaintiff contends that Defendant Welch both promised and then later refused to call Dr. Totonelly as a substitute witness for Dr. Glick, despite his being initially named as a witness in a Fed. R. Civ. P. 26(b)(4) statement. She avers that she tape-recorded a conversation with Defendant Welch wherein the parties engaged in the following exchange:

**Ms. Puppolo:** Jack, why cannot he be used if he's named in the 26(b)(4)?

**Mr. Welch:** Because I indicated to the defense a long time ago that we were going to use Dr. Glick.

**Ms. Puppolo:** It doesn't matter. If he's named, he's usable.

**Mr. Welch:** Celeste, look,

**Ms. Puppolo:** Jack, if you really wanted Totonelly, you could use him.

**Mr. Welch:** Celeste, what we need to do is – you need to get a motion to continue, 'cause that's what you want.

**Ms. Puppolo:** Jack, why don't you want to use Dr. Totonelly, 'cause he's too powerful, and the case is going to be a big win? If he's on a 26(b)(4), according to the rules –

**Mr. Welch:** Listen. You need to send me an email telling me, one, move for a continuance, and I understand you will be withdrawing from the case. Just do that. Here's the choice we have here. Either I try the case the way I think it should be tried, or you'll need to get another attorney, and we need to tell the court, "Look, Your Honor, we've got a big problem here, and Mister, you know, Mr. Welch and Ms. Puppolo have a vast difference of – ["]

**Ms. Puppolo:** Well, it's, it's a lot worse than that, to me. It's, you know, it's, it's what's happening around us, that I don't think there's time enough to accommodate.

**Mr. Welch:** Celeste, I – Celeste, I – There's no way I'm gonna, There's no way I'm gonna get involved with hair samples, okay? I'm not going to do that.

**Mr. Welch:** I'm not gonna, I'm not gonna do it.

**Ms. Puppolo**: Yeah, yeah, but that's why I don't feel like you're acting in my best interest.

**Mr. Welch:** I, I, I got that, Celeste. You don't think I'm acting in your best interest, and that's – You're entitled to your opinion. Well, look. So, I'm not going to do it. Okay? So, the thing is, is, that, you know, what I need to do, Celeste, is I need to get an email from you, okay? – Giving me a directive. Okay. And then I'll act on the directive. I'll act very promptly on the directive.

**Ms. Puppolo:** We're smack up against the trial itself. And, our medical expert witness is doing strange things, which seems to be playing right into the defense's ability to eliminate the only expert witness – which of course would then be fatal to the case. There's something very wrong with this picture, Jack.

**Mr. Welch:** Okay. Well, Celeste, what I need from you is a very clear directive on the email ...

**Ms. Puppolo:** And they're using the grounds that he simply changed his testimony as reason why he should not be allowed to testify?

**Mr. Welch:** Essentially it, in a nutshell. Yeah. Okay, and, as far as I'm concerned, it's bogus, okay? And as soon as you and I get through talkin'–

**Ms. Puppolo:** Well, but, but they would never have known about it, had you not gone running to them with the fact that he changed his testimony.

**Mr. Welch**: Right. You're right. They would, never would have known about it if I hadn't a' been, uh, a lawyer who happens to, uh, be a lawyer who takes pride in his professionalism, and his integrity, and takes pride in being professionally responsible, and takes pride in making sure that I disclose very promptly to the other side when there's been a change.

**Ms. Puppolo:** Why?

**Mr. Welch:** That's the way I practice law.

**Ms. Puppolo:** Why? That –

**Mr. Welch:** Some lawyers do it differently.

**Ms. Puppolo:** No lawyer would, no lawyer for the plaintiff would ever do that. Mary, do you follow that?

**Ms. Sheridan:** No question. And I'm not a lawyer. But it seems to me like the –

**Mr. Welch:** I beg to disagree. Okay?

*Id.* at 17-18, ¶ 50.

Refusal to Discredit Vermont Medical Examiner

65.    After having conducted direct discussions with me about his being able "to place [his] entire fist into the lumbosacral wound" of my aunt and expressing his belief that Crescent Manor had "administered a massive overdose of Duragesic" into my aunt, Vermont State Medical Examiner Paul Morrow mismeasured the tear in my aunt's lumbosacral region as "1 centimeter," entered this mismeasurement into his autopsy report, and claimed in his final autopsy report that my aunt died of "natural causes." Mr. Welch, in the underlying medical malpractice case, was in custody of Dr. Morrow's initial excited utterances on an audio answering machine tape as Dr. Morrow was both 1) descriptive of my aunt's gaping lumbosacral wound and 2) exclamatory, with "Wow," as he was concomitantly viewing the very chart that showed the violated administration schedule and massive overdosing of fentanyl.

66.    Mr. Welch refused to expose Dr. Morrow's mismeasurement and would not show the jury the scientific ruler I brought with me for him to use in trial. I entreated Mr. Welch to discredit Dr. Morrow in my teleconference with him and Ms. Sheridan on December 31, 2009[.]

* * *

69.    Mr. Welch agreed on December 31, 2009 to impeach Dr. Morrow[.]

* * *

71.    Mr. Welch later reneged on impeaching Dr. Morrow with Mr. Dodig's own testimony given that Mr. Dodig had spoken the following into my answering machine: "I'm on your side ... You deserve credit for not having trusted the autopsy. You've done a heck of a job as an investigator. Your intuition has proved to be effective thus far, so we'll wait for the evidence to come in."

* * *

72.    Mr. Welch promised me that he would use the above-referenced recordings at trial to impeach Defendant Mr. Dodig and his law firm, and the Defendants' witnesses. Mr. Welch, though I was relying on him to do so, did not do so.

*Id.* at 24-26.

## Failure to Depose and Properly Cross-Examine Defense Experts

Plaintiff avers that Defendant Welch promised to depose defense expert witnesses in the Dodig malpractice action, failed to do so, and "reneged on his promise to [her] that he would expose the fact that [defense expert witness] Dr. Von Wilking was an active member of the National Association of State Jury Verdict Publishers." *Id.* at 34, ¶ 85. She avers Mr. Welch promised to cross-examine Dr. Von Wilking with the Physician's Desk Reference's warning regarding fentanyl dosages exceeding [25] mcg and failed to do so.

## Summary of Breached Promises

At the conclusion of her affidavit, Plaintiff summarized Defendant Welch's breached promises as follows:

80.    Mr. Welch had promised to subpoena for trial those key Crescent Manor nurse fact witnesses who had direct knowledge of events in my aunt's death, but he left the Estate high and dry by not having subpoenaed a one. Mr. Welch, during the trial, like he assured me with Brianne DiMaggio, L.N.A., promised to call Dr. Totonelly "on rebuttal." Two weeks before the trial, he responded to me that he would call Dr. Totonelly as a

> witness, since, at trial, as I had predicted, it became so evident that we needed Dr. Totonelly's longstanding opinion on causation, which had remained a constant, and had never been changed by anyone. However, Mr. Welch did not come through as he agreed to[.]

* * *

> 100.   Mr. Welch was not honest with me while representing the Estate because he said one thing in our preparation and did the polar opposite when we got to court. I knew that Mr. Welch was deceitful right after mediation, November 16, 2009, as he mishandled the Estate's trial evidence and failed to subpoena essential fact witnesses. Two weeks before trial, also in the presence of Mary Sheridan, Mr. Welch promised to subpoena Brianne DiMaggio, L.N.A. for her fact witness testimony, but he did not. I worried that he was sabotaging the case and I could not understand why. I attempted to bring in other lawyers to monitor/help him, to which Mr. Welch agreed, but then he reneged on that also, on the morning of pretrial, when it was then too late to do anything about it.

*Id.* at 30, ¶ 80; 37, ¶ 100.

> With regard to Count IV, Plaintiff asserts a single disputed fact: that she did not consent to payment of the $7,223.10 in satisfaction of Attorney Dodig's counterclaim. *See id.* at 34, ¶ 89 ("Mr. Welch, without my authorization, paid the Defendant who had conceded on the stand to having run the wrongful death and survival statutes, $7,223.10."). She does not dispute that she was present in the courtroom on both January 22 and January 25, 2010, when her attorney agreed to the payment of $7,223.10 on the Estate's behalf.

(Case 5:14-cv-00095, Opinion Document No. 88 at 9, ¶ 2–16, ¶ 1)

121.   Attached hereto and incorporated as allegations of verified fact is the Affidavit of

Celeste A. Puppolo, dated August 15, 2016. The Estate executor described with specificity

individual occurrences relevant to the defalcations of underlying defendants, their

fraudulent actions as excerpted and cited by this Court, and claims forthwith

reimbursement of $7,223.10, *supra*. (*See*, <u>Exhibit 19</u>, Affidavit of Celeste A. Puppolo,

Estate executor.)

122.    In the U.S. District Court, Mr. Decato, who had been retained to set the record straight on fallacious defense material launched by Mr. Welch at trial in the Estate's case, then permitted the same and other exogenous defense material to bleed into parties' *Daubert* hearing. Mr. Decato inexplicably chose not to refute false statements made by opposing counsel that before had never been made in the Estate's case prior to the hearing.

123.    Although Mr. Decato departed from upholding truthful case facts in parties' *Daubert* hearing, he convinced the Estate executor all could be corrected as the case moved forward.

124.    But for weeks Mr. Decato let false conclusions of the defense be undisputed and opposite the truth. Mr. Decato was well aware of the facts, and ongoingly kept promising the facts would be litigated. Yet Mr. Decato's aversion to argue certain material facts was missed by the Estate executor in real time, though later took on the optics of case sabotage and harm to the Estate when the Estate executor read in U.S. District Court Opinion Document No. 84 about his willful omissions and obvious commissions.

125.    After the *Daubert* hearing, Mr. Decato still held back from refuting false statements made by opposing counsel that never had before been put forth in the Estate's case prior to the *Daubert* hearing.

126.    For example, Mr. Decato agreed to impeach the unopposed case trial testimony of defense medical expert witness Spencer Von Wilking, M.D., as was an agreed precondition for Mr. Decato's retainment on the case. This Court, as cited above, noted the Estate executor's known upset with Von Wilking's trial attestations that were masked by Mr. Welch and then suppressed by Mr. Decato.

127.    At trial, Dr. Von Wilking had testified before the jury of Eva Puppolo's gaping sacral wound that "it's not that big a deal," and that the *PDR* was an inconsequential manufacturer's guide.  He rhetorically asked the Superior Court and Jury: "You know who

writes that thing? Oh, the drug manufacturers write that thing. I never listen to what they say." (This quote is transcribed verbatim from the official Vermont Superior Court case trial audiocassette.) (*See,* Exhibit 20, Superior Court Trial Transcript, testimony of Spencer Von Wilking, M.D. at 165:1-3.)

128.    Mr. Decato concretely promised on his retainment, were he to have the opportunity in the U.S. District Court to impeach Dr. Von Wilking's wildly preposterous testimony, he would compensate for Mr. Welch's having been at a loss for effective cross-examination of Dr. Von Wilking at trial. Instead, Mr. Decato, silent, blocked the opportunity to correct and impeach opposing counsel's Von Wilking testimony and allowed Von Wilking's medical mythology to stand, by playing into Mr. Welch's overall case sabotage that in parties' *Daubert* hearing was a sellout of the Estate's interest on the deepest of scientific levels.

129.    In an order issued post-trial, the Superior Court had concluded that Mr. Welch could have requested a continuance to depose Dr. Von Wilking, mid-trial. Mr. Welch evidently had failed to avail himself of such necessary discovery procedures. The *Puppolo* decision in Vermont Supreme Court recognized that Mr. Welch had waived his right to a continuance for deposing Von Wilking at trial when Mr. Welch did not request a continuance right then and there. (*Puppolo v. Donovan & O'Connor, LLC*, 2011 VT 119, 191 Vt. 535, 35 A.3d 166)

130.    On February 17, 2017, Mr. Decato had contacted the Estate executor to renew his contractual agreement as to how he would handle the Von Wilking matter during parties' *Daubert* hearing. Mr. Decato assured that Plaintiff's *Daubert* testimony would be supported by validation and grounds based on 1,762-pages of bates-stamped evidentiary documents Decato Law had in its custody. It had been agreed between the executor and Mr. Decato that the *Daubert* hearing required exacting attention in meeting the *Daubert* standard and would be Plaintiff's opportunity to submit all case evidence that Mr. Welch jettisoned before and during trial. According to Mr. Decato's promise, Plaintiff, at the *Daubert* hearing,

would have a full presentation of the Estate's evidence by him, all grounded in scientific methods and procedures.

131.    However, within the *Daubert* hearing timeframe, the Estate executor received from Decato Law drafts of Defendants' oppositions to summary judgment that did not include a Statement of Genuine Issues of Material Facts in Dispute or evidence from the Estate's case against Mr. Welch that would have shown genuine dispute in several areas of its claims. The Estate executor drew Mr. Decato's attention to this and he indicated he was responsive to her concern. But Mr. Decato, according to the Court, also needed to address Defendants' Statement of Undisputed Facts. The Estate executor did not know about Mr. Decato's defaulting until she read the Court's criticism in Opinion Document No. 84. The Court later referenced Defendants' lack of evidentiary support in general, and cited *Celotex*:

> At the summary judgment stage, Plaintiff must proffer admissible evidence in support of the essential elements of her claims or accept their dismissal. See *Celotex*, 477 U.S. at 322 … On those undisputed facts, Defendants have established that Plaintiff ratified the judicial admissions made on her behalf.

(Case 5:14-cv-00095, Opinion Document No. 88 at 22, ¶ 2; 23–24, ¶ 2)

132.    Despite the gamut of defense allegations that were false and left unopposed by Mr. Decato, the Court further opined:

> As a result, the facts set forth in Defendants' Statement of Undisputed Facts are deemed admitted. See Fed. R. Civ. P. 56(e)(2) (where the party opposing summary judgment does not dispute material facts asserted by the moving party, the court "may consider the fact[s] undisputed for purposes of the motion").

(*Id*. at 18)

The Court ended its decision with *Celotex* and granted summary judgment:

> Plaintiff fails to proffer any evidence to the contrary, and thus fails to establish her breach of contract claim in Count IV. Because "a complete failure of proof concerning an essential element of the nonmoving

> party's case necessarily renders all other facts immaterial[,]" *Celotex*,
> 477 U.S. at 323, Defendants' motion for summary judgment on Count
> IV is GRANTED.

(*Id.* at 24)

133.    Plaintiff, to have survived summary judgment, had to prove that but for Mr. Welch's

negligence, there would have been, more likely than not, a favorable outcome. Presentation

of the Estate's evidence by Mr. Decato could have made that difference. The Court held:

> When the moving party has carried its burden, its opponent must
> produce "sufficient evidence favoring the nonmoving party for a jury
> to return a verdict for that party." *Anderson*, 477 U.S. at 249. Federal
> Rule of Civil Procedure 56(e) and Local Rule 56(c) require a party
> opposing summary judgment to identify disputed facts relevant to the
> essential elements of a claim or defense. See *Anderson*, 477 U.S. at 250.

(*Id.* at 16–17)

134.    The U.S. District Court also specified in its Opinion:

> In this case, Plaintiff's Statement of Disputed Material Facts does not
> directly respond to Defendants' Statement of Undisputed Facts or
> establish how the facts on which Defendant relies are in dispute through
> citation to record evidence. As a result, the facts set forth in Defendants'
> Statement of Undisputed Facts are deemed admitted. <u>As a result, had
> Plaintiff prevailed in her legal malpractice claim against Defendants,
> she would have been able to recover the value of the Estate's claim for
> Eva Puppolo's bodily harm</u>.

(*Id.* at 19–20, ¶ 3) (Emphasis added.)

135.    Mr. Decato represented to the Estate executor that the Estate could still recover from

summary judgment. He confirmed that the Estate's legal expert witness Mr. O'Toole had

drawn the causal connection between Mr. Welch's dishonest acts and the injury that resulted

to the Estate's case. Mr. Decato represented he would appeal the Court's summary judgment

ruling. But on June 20, 2019, it was discovered by the Estate executor that,

incomprehensibly, Mr. Decato had again withheld the Estate's key material evidence and

had not argued crucial material facts of the Estate's case.

136.    It was Mr. Decato's responsibility to protect the integrity of the Estate's case evidence and of Mr. O'Toole's expert reports that contained material facts supporting the Estate's case evidence. Mr. Decato disregarded his retainment promises despite protracted and ongoing agreements with the Estate executor to expose in the higher court Mr. Welch's fraudulent acts and safeguard submission of Mr. O'Toole's expert reports that Mr. Decato assured the Estate executor were timely filed. Plaintiff had a chance at parties' *Daubert* hearing to plead the case-in-chief's most cardinal facts, but Mr. Decato caused history to repeat itself when he hid the fraudulent precedency of Mr. Welch and made it stand.

137.    Defendants had received, amassed, and bates-stamped 1,762 pages of trial court evidentiary documents to prove Mr. Welch's acts of fraud upon the court and all the blatantly aberrant moves Mr. Welch had made that brought harm to the Estate's case.

138.    Mr. Welch's acts of fraud upon Vermont Superior Court were well-articulated in the appeal made to Vermont Supreme Court by Nancy Waples, Esq., who, with her law firm Hoff Curtis solidly identified the fraudulent acts of Mr. Welch at trial. Mr. Decato proposed that he would incorporate Atty. Waples' case arguments after he learned she had offered the Estate executor *pro hac vice* sponsorship and encouraged the executor to move forward with the Estate's case. (*See,* Exhibit 21, Email to Estate executor from Nancy Waples, Esq.

139.    According to Hoff Curtis' legal research as relegated to Mr. Decato, Mr. Welch had violated acceptable standards of care:

    a.  by failing to depose Mr. Dodig
    b.  by failing to serve discovery on Mr. Dodig
    c.  by failing not to allow Mr. Dodig to testify on the merits of the underlying medical malpractice case without objecting and asking the Court for a continuance
    d.  by failing to depose defense expert witnesses
    e.  by failing to use the Estate's evidentiary and legally recorded audio tapes to impeach defense witnesses

    f.  by failing to bring to trial Dr. Totonelly as the Estate's causation witness and lying to Vermont Superior Court that Mr. Welch needed to "retain" and/or "recruit" and "substitute" medical examiner and pathologist Dr. Glick in clinician Dr. Totonelly's stead

    g.  by failing to subpoena for trial key nurse fact witnesses assigned to Eva's care at Crescent Manor and who possessed firsthand material information about Eva's treatment in residence at Crescent Manor

    h.  by failing to use at trial hair sample forensics (that the Vermont State Medical Examiner recommended be performed to show the lethality of fentanyl levels in Eva, since Eva had no previous tolerance to the drug fentanyl)

    i.  by failing to introduce forensic document evidence that Crescent Manor health care providers had altered and falsified Eva's medical record charts

    j.  by failing to use a crucial police report as evidence at trial

    k.  by failing to call at trial Licensed Nursing Assistant Brianne DiMaggio who described both medical records falsification and witness tampering that she had observed at Crescent Manor and who reported to police evidence of battery as to the manner in which Eva was injured and lost her life by fentanyl intoxication by changing Medical Examiner Benjamin Glick, M.D.'s expert testimony in Mr. Welch's fraudulently constructed unsigned affidavit that appeared signed at trial and adversely affected causation in the case by making Dr. Glick's medical expert opinion on Eva's fentanyl lethality merely contributory and no longer the sole cause of death

## IV.    <u>STATEMENT OF CLAIMS</u>
### COUNT I – FRAUD

140.    Plaintiff incorporates each of the foregoing paragraphs as if set forth fully herein, with material evidence attached in support of stated facts and claims.

141.    Mr. Decato lied to the Vermont Superior Court Probate Division that he could not reach the Estate executor for her participation in a critical probate hearing. He never once telephoned her. Upon information and belief, Mr. Decato knew that the Estate executor's absence was likely to cause the Superior Court Probate Division to revoke her executorship and free himself of the possibility she could bring a lawsuit against him.

142.    Mr. Decato, throughout his tenure, had a fiduciary duty to prosecute Mr. Welch's fraud and to reveal to the Court the truth of the case and to his client the case's true disposition.

143.    When Mr. Decato spoke in half-truths to the Estate executor with respect to the import of U.S. District Court Opinion Document No. 84, it amounted to willful, false misrepresentation as to the true facts of the Estate's case. The Estate, the Estate executor, and Celeste A. Puppolo individually sustained damages in reliance upon Mr. Decato's false and fraudulent misrepresentations, omissions and practices, and must be provided a private right of action as a consumer who contracts for legal services in the State of Vermont.

144.    Mr. Decato chose to conceal when he had two separate duties to disclose. He had a fiduciary duty to his client, the Estate, and he had a lawyer's sanctified duty to tell the truth to the Court. Had Mr. Decato disclosed to the Estate executor the above-stated disparaging facts about himself in Opinion Document No. 84, the Estate executor has attested she would have withdrawn her trust and reliance upon him and retained other legal representation. Instead, the executor acted in reliance upon Mr. Decato's untruths and fraudulent misrepresentations of case disposition.

145.    As in constructive fraud when a seller purposefully does not tell a customer about defects in a product, Mr. Decato, a charismatic seller of himself, concealed from his client defects that, even after curtain time, were seen by the executor as positive, not negative, as Mr. Decato intentionally drew false pictures. Mr. Decato made a conscious effort to create a false impression on the Estate executor, his knowing that she would rely on him.

146.    Following Defendants' untimely filings in the Estate's case, the Court rendered its conclusion in Opinion Document No. 84, with the Court's focus on intent:

> Plaintiff's noncompliance was *willful* and the period of noncompliance
> was inexcusable.

(Case 5:14-cv-00095, Opinion Document No. 84 at 17, ¶ 1) (Emphasis added.)

147.    As a result, Mr. Decato's reckless disregard for timely submission of Mr. O'Toole's legal expert opinion caused great damage to the Estate. The Court then granted Mr. Welch's motion to strike the Estate's legal expert opinion. This led to loss of the Estate's Count I in its Complaint of legal malpractice against Mr. Welch. Mr. O'Toole testified in parties' *Daubert* hearing that the Estate's evidence Mr. Welch chose not to use at trial "would go to the issue of ill will and malintent, yes." (*Daubert* Hearing Transcript at 84:10-18)

148.    Nonetheless, Mr. Decato did not present in material detail or expatiate on the Estate's indispensable case evidence for Mr. O'Toole to opine further. Mr. Decato's circumstantial pattern of promising that all work would be done was most misleading because Mr. Decato was in concert with opposing counsel to mollify Mr. Welch's failures and treacherous acts.

149.    As for Count II of the Estate's Complaint against Mr. Welch, the Estate executor had notified Mr. Decato by email that his drafted Opposition to Summary Judgment, dated April 4, 2018, was about to be filed with a serious error. The error was a discrepancy that, in the Opposition's body, preserved and "defended" the integrity of Plaintiff's Count II, Negligent Misrepresentation, in a Statement of Material Facts In Dispute, but contradicted the preservation of Count II in his Opposition's Conclusion. In plain language, Mr. Decato "conceded" Count II in his conclusion. This literal language construction the Estate executor reported to Defendants at 5:30 a.m. on April 4, 2018, at which time Mr. Decato assured the executor that the discrepancy was corrected.

150.    However, as evidenced in Opinion No. 88, Mr. Decato's language discrepancy persisted. The Court in its holding relied on his Opposition's literal, false conclusion that Plaintiff had conceded Count II. Mr. Decato's fraudulent misrepresentation to the Estate executor that the linguistical problem had been corrected, when it had not, caused full unraveling and preclusion of Count II. Mr. Decato's diametrically opposite, conclusory assertion conceding Count II had never been corrected. Mr. Decato further represented that he could revive Count II with its supportive evidence and use it forward.

151.    The Estate executor has since learned that Plaintiff was bereft then of its ability to carry forward the Estate's evidence supportive of Count II from case inception, and that, consequently, evidentiary support for Count II had been derailed by Mr. Decato. When the Court averred that Count II had been "conceded" without any countervailing evidence or explanation put forward by Mr. Decato as to how in those few words Count II should not be wholly sabotaged by his plain language literacy problem, the Court took his Opposition's conclusion as literal and definitively struck Count II.

152.    The Court rightfully struck Count II for Mr. Decato's outright, literal conclusion that stated Plaintiff was conceding its own Count II. After Mr. Decato had explained to the Estate executor that Count II would be reconfigured in its substance and could be litigated further as a substituted or relative version of Count I, the executor accepted Mr. Decato's explanation, but his conveyed calculus was nothing but false pretense.

153.    On Count Ill (Breach of Contract), Mr. Decato not only misled his client, he misled the Court. He neither gave to the Court the Estate's case material evidence to show the contractual relationship that existed between the Estate and Mr. Welch, nor put forth apposite argument to demonstrate that Mr. Welch had breached his contractual agreements.

Mr. Decato, while not disclosing and pleading known case evidence, actively misled his client on the promise that lastly he would produce all evidence for the Estate yet to prevail—namely, Mr. Welch's breaches of contract during trial and the Estate's financial matters. Mr. Decato instead became a mirror image of Mr. Welch. Superior Court Judge Lon McClintock opined on the Estate's claims of financial fraud currently still being adjudicated as a probate matter from the Estate's underlying case:

> Estate money was within Attorney Welch's control, and
> without Ms. Puppolo's permission, the money was turned
> over to Attorney Dodig.

(Attachment A at 26:25; 27:1-2)

154.    Mr. Decato's breach of duty as a member of the Bar and his breach of duty in levying fraud upon the Court while ultimately hiding publicly facts of Mr. Welch's legal malpractice are actionable as an act contrary to Mr. Decato's promises made to his client in the entrepreneurial practice of law. Of funds usurped by Mr. Welch, Judge McClintock stated: "You may recuperate those for his bad dealings …" (Attachment A at 23:18-19)

155.    Mr. Decato's determination not to submit vital case evidence at a *Daubert* hearing, and not to utilize case key witnesses, echoes the underlying fraudulent matters where crucial case evidence was shockingly withheld by Mr. Welch at trial. Layers of reckless indifference to Plaintiff's evidentiary truth resurfaced with Mr. Decato as if events in the U.S. District Court, when all was said and done, were a déjà vu dress rehearsal of past performance by Mr. Welch in Vermont Superior Court.

156.    Mr. Decato, while in possession of the Estate's case evidence, had knowledge of the case materially and of apt legal principles, specifically given weight of the evidence as would warrant punitive damages. Mr. Decato had represented to the Estate executor that

an attorney would never deter a plaintiff's ability to request exemplary damages in a case where there was solid evidence of malfeasance and fraud.

157.   Early in Defendants' tenure as counsel advocates in this case, from August 1, 2015 through December 16, 2016, Mr. Decato had included within Plaintiff's submissions to the Court evidence of Mr. Welch's aforesaid deception, only later to embody Mr. Welch's pattern of repetitive, deceptive conduct. Conclusions were not drawn by the Estate executor until after the executor compared all that was promised by Mr. Decato in his retainment with this Court's determination in Opinion No. 84 regarding Mr. Decato's willfully destructive actions vis-à-vis case procedural events.

158.   All the while, Mr. Decato kept imperceptible to the Estate executor his omissions and commissions while he counted on the credulity of the Estate's gullible and trusting executor. He distracted the executor by sharing legal books with her such as David Ball's *Reptile* and Edward Imwinkelried's *Evidentiary Foundations,* as well as Defendants' other law office client matters that, unrelated to the Estate's case, Mr. Decato shared in his drafted briefs and motions. He stated that he would pay the executor for her work and skill as an accomplished editor to review his submissions prepared for his other cases, but he never did pay her for exogenous work she completed for him.

159.   As Mr. Decato withheld promised legal action on the Estate's case while at the same time still promising bold execution, he kept the Estate executor hopeful, but in the dark.

160.   Early in his tenure, Mr. Decato submitted motions to the Court that described Crescent Manor staff's conduct as having a guilty mind or *mens rea.* Mr. Decato argued that "a lottery" had ensued among certain nurses at Crescent Manor who were pegging times as to when Eva Puppolo would die from fentanyl's effects of hypoventilation. With

facts culled from the testimony of Nurse DiMaggio, Mr. Decato had coined the "lottery" as culminating from nurses' joking discourse that was witnessed and reported by Nurse DiMaggio two hours before Eva Puppolo's fateful death. But Mr. Decato clandestinely dropped the ball of his investigatory pursuit on this matter before these facts needed support at parties' *Daubert* hearing.

161.    Mr. O'Toole opined nevertheless at parties' *Daubert* hearing that Crescent Manor nursing staff was proposing "to guess when Eva Puppolo would die from the fentanyl." Mr. O'Toole expatiated upon these evidentiary claims in writing and this Court then cited Mr. O'Toole's testimony in the following passage of Mr. O'Toole's legal expert opinion:

> This evidence would go directly to the issue of malice and to the issue of punitive damages … If this evidence was presented, along with the evidence of the altered medical records and the evidence from Dr. Totonelly, Brianne DiMaggio and some of the other nurses, then the Estate's claims of negligence and for punitive damages would likely have succeeded.

(Case 5:14-cv-00095, Opinion Document No. 84 at 12, ¶ 1)

162.    The eyewitness testimony of Nurse DiMaggio and other Crescent Manor nurses had been excluded at trial by Mr. Welch. Mr. Decato, despite contractual promises never to default on utilizing Nurse DiMaggio and key Crescent Manor nurse witness testimony at a hearing or trial, followed pursuit of Mr. Welch and never sought Mr. O'Toole's opinion at parties' *Daubert* hearing on the mishandling of nurse witness testimony by Mr. Welch. Crescent Manor nurses were available and ready if needed to corroborate the legal expert conclusions of Mr. O'Toole as he had drawn them from his 5-year review of Eva Puppolo's Crescent Manor medical records.

163.    Nurse DiMaggio was a whistleblower who went to the police about what she had witnessed at Crescent Manor, and it is implicit in an evidentiary police report that the Bennington police intake sergeant was not "investigating her," Nurse DiMaggio, as opposing counsel Mr. Cleary in parties' *Daubert* hearing fabricated. When Mr. Cleary came forth with the allegation, it went entirely without objection by Mr. Decato.  (*Daubert* Hearing Transcript at 199:15-25; 200:1-22)

164.    On January 2, 2017, Mr. Decato specified to the Estate executor that he could call Nurse DiMaggio as a witness during the *Daubert* hearing but he did not use the nurse's testimony in any form or engage the nurse at all.

165.    Before the *Daubert* hearing, Dr. Totonelly reviewed Crescent Manor's having failed to make sufficient and proper medical recordation of Eva Puppolo's care and treatment. Crescent Manor had caused to be missing from Eva's medical chart five months of pertinent medical records directly preceding the last month of Eva's life, and falsified the remaining, serially reported Nurses' Care Plan that was deemed altered in a material way, as determined by Joan McCann & Associates, Inc., Boston, Massachusetts forensic document examiners. Mr. O'Toole also based his legal opinion on the McCann findings.

166.    Judge Suntag, at pretrial in this case, had requested that the McCann report, for immediate chain of custody, be faxed from McCann firm's Boston office to his chambers. McCann's forensic conclusion was that the Crescent Manor Nurses' Care Plan had been tampered with and changed in a material way. However, Mr. Welch never obtained the report from the Judge's Chambers for use at trial. Mr. Decato next also left this stone unturned at parties' *Daubert* hearing despite his word to the Estate executor that he would utilize Mr. O'Toole's scientific testimony with respect to the McCann forensic document examination report.

167.    Mr. Decato suppressed at the *Daubert* hearing the act of negligence by Mr. Welch to disregard the McCann findings and successively breached contract in the same way. Despite Mr. O'Toole's preparation to testify on what should have been a spoliation matter, Mr. Decato never admitted critical case evidence in support of Mr. O'Toole's *Daubert* testimony regarding the missing medical records or falsification of Eva Puppolo's serially reported medical record.

168.    Mr. Decato promised to submit as evidence the Estate's forensic toxicology results and hair sample evidence. Mr. Decato held back crucial scientific evidence throughout the *Daubert* hearing, even though he had contractually promised the executor he would use it. Mr. O'Toole relied upon the Estate's forensic toxicology results and, for the *Daubert* hearing, as a product of scientific methodology, Mr. O'Toole equally relied on the science behind fentanyl lethality as measured by *DTDCM*-established values for fentanyl fatalities, the toxicologic standard being the medical examiners' authority, *Disposition of Toxic Drugs and Chemicals in Man*. (Exhibit 12)

169.    Neither National Medical Services toxicology findings nor the faxed order for fentanyl administration at Crescent Manor were pled by Mr. Decato in parties' *Daubert* hearing, despite Mr. O'Toole's readiness to engage his scientific methodology for the Court's assessment. Mr. Decato, however, unfathomably gave no evidentiary deference to case hair sample toxicology in parties' *Daubert* hearing when it was needed to disprove opposing counsel's false arguments stemming from Plaintiff's underlying medical malpractice case. Out-of-the-blue, defense-contrived notions from case trial testimony dominated the *Daubert* hearing, and Mr. Decato reneged on his promise to object to fallacious defense allegations, as he permitted opposing counsel to argue fiction over fact.

56

170.    After the *Daubert* hearing, Mr. Decato falsely misrepresented to the Estate executor that the Court order for Plaintiff to send evidentiary case audio tapes to Judge Reiss for her listening had been met. The Estate executor was made to believe by Mr. Decato the fact was true when it was false. Mr. Decato never sent to Judge Reiss the case audio tapes she requested she hear.

171.    Mr. Decato had a duty to disclose truthful facts with respect to case evidence because his fiduciary relationship with the executor warranted "trust and confidence" in one another. Mr. Decato's false statement regarding case audio recordings was made with the intention and expectation that the Estate executor would rely upon him in imminent and future case proceedings. The executor found out about this when reading Opinion 84. The Estate's case audio recordings are replete with 1) evidence of false statements made and proffered to the trial court by Mr. Welch, 2) testimony of case lay and expert witnesses, 3) conversation between the Estate executor and Mr. Welch, and 4) excited, telling statements by Mr. Dodig, as stated below.

172.    Mr. Dodig had left on the Estate executor's answering machine recorded words that the executor preserved for trial and that Audio Evidence Lab of Mansfield, TX technically analyzed and deemed evidentiary for use in the court of law. Mr. Dodig also had interviewed Nurse DiMaggio to learn it was her attestation that the serially reported Nurses' Care Plan had been altered after Eva Puppolo's death to undermine Eva's prior stable health at Crescent Manor. Mr. Dodig met with Nurse DiMaggio and later conferred with Henry F. Puppolo, Eva's brother, after their meeting. As was recorded on an incoming audiocassette, Mr. Dodig excitedly vocalized his opinion to the Estate executor that the Estate was up against "an outrageously large and unthinkable cover-up." (Exhibit 7)

173.    Mr. Welch neglected to submit the above-stated evidence at trial, after Plaintiff on

his instruction had financed the audio analysis and approval of Plaintiff's audio recordings

for evidentiary use. Mr. Dodig's excitedly voiced opinion was a part of the audio

recordings requested by Judge Reiss in her order.

174.    Mr. Decato contractually promised the Estate executor on his retainment that all

audio evidence would be submitted to the Court. Instead, Mr. Decato tricked the executor

and obstructed truthful disclosure of the Estate's matters by withholding the audio evidence

from exposure to the Court, both before and after the *Daubert* hearing. At the same time,

Mr. Decato concealed the Court's holdings pertaining to himself while he was busy

protecting the overall sweeping malfeasant acts of Mr. Welch in the underlying case from

exposure in the U.S. District Court.

175.    The audio recordings were submitted to Defendants in both digital and analog form.

They accompanied Mr. Decato's 1,762-page, bates-stamped case file that Decato Law

requested be compiled for case use. (Plaintiff's audio recordings had been also formatted

onto compact disks at Audio Evidence Lab since the lab specialized in forensic audio

recording transfer should the format better suit the convenience of parties and the Court.)

176.    Mr. Decato had represented to the Estate executor on July 31, 2015, as a condition

of his retainment, that he would have the Estate's case audio recordings professionally

transcribed and certified for submission to the U.S. District Court.  Without explanation,

Mr. Decato reneged on his promise, both to his client and to this Court, after he represented

to the Court on April 4, 2017, with respect to submission of the case audio recordings: "We

will do that if you give us leave to go get them and give them to the Court." Judge Reiss

stated to Mr. Decato, "… you told me that you can get me the audiotapes." Mr. Decato lied

to his client that he had mailed by FedEx the audio recordings to the Court. According to

this Court's Opinion, he never had. Mr. Decato also never produced the certified transcripts

he promised, after Judge Reiss informed him then inquired: "[W]e don't have certified

transcripts. Do you have audio recordings? Because that's the best evidence." (*Daubert*

Hearing Transcript at 7:19-25; 8:3-4 and 8:16-18)

177.   Mr. O'Toole attested that he personally had listened to the audio recordings in 2012

when he first studied the Estate's case and later read Parties' Transcription of Case Audio

Files after Defendants secured him as Plaintiff's legal expert. It was at parties' December

16, 2016 procedural hearing that Judge Reiss executed her order she be sent Plaintiff's

audiocassette recordings so she could listen to them.

178.   At parties' *Daubert* hearing, Judge Reiss again reiterated her order for submission

to the Court the Estate's case audio recordings and articulated what had been her reasoning.

In fact, the Judge asked Mr. Decato for the audio recordings three times at the hearing.

With reference to the Estate executor, present in the courtroom, Judge Reiss stated:

> Well, she could either authenticate them – if she was on the stand, she
> could say, "I talked to Attorney Welch. I recognized his voice. I used
> this phone number that is associated with him," and that would be fine.
> … If you give me the audiotapes, that's the best evidence.

(*Daubert* Hearing Transcript at 7:4-10;15-19, 25 and 211:7-8)

179.   At the *Daubert* hearing, Judge Reiss gave Mr. Decato a second chance to submit

the audiocassette evidence she wanted to hear. The Estate executor emailed reminders to

Mr. Decato as the executor had seen firsthand the Judge's resolve.

180.   The Estate executor, in keeping, produced seven affidavits to authenticate further

the audiocassettes in terms of date and place. The case audio recordings had been produced

in Washington, DC, Cambridge, NY, and in Hudson, NY. (*See,* Exhibit 22, Seven affidavits sworn by the Estate executor.)

181.   Mr. Decato, stunningly, according to Court Opinion 84, never at any time complied with the Court's order to submit the Estate's vital audio recordings.

182.   Mr. O'Toole, at parties' *Daubert* hearing, had drawn a definitive connection between his listening to the audio recordings and his legal expert opinion. However, he couldn't recall at the *Daubert* hearing the precise full date on which he had listened. It was Mr. O'Toole's belief that the recordings had made a "permanent impression" on him when he first listened, and that he could recall the "intensity of the dialog[ue]." (Case 5:14-cv-00095, Opinion Document No. 84 at 15, ¶ 2)

183.   Mr. O'Toole's legal expert testimony extended to Nurse DiMaggio's personal acquisition on audiotape also, that Crescent Manor had hired former care center personnel to alter Eva Puppolo's medical charts. (Exhibit 7)

184.   Mr. Welch is heard on audiotape stating that Mr. Dodig suppressed Nurse Brianne DiMaggio's personal audio recordings as well as Nurse DiMaggio's written journal that she kept after she had gained the information that Crescent Manor employed a nurse's aide to falsify Eva's medical record: "[A]bout altering records, the jury's going to scratch its head and say, 'What the hell you doin' not putting the case on?'" (*Id.*)  For trial, Mr. Welch and the Estate executor had isolated the most compelling witness admissions on the audio recordings. But Mr. Welch flipped the switch on his intention to *put the case on*, as he had articulated. Mr. Welch actively suppressed the Estate's case audio material evidence at trial and did not subpoena the witnesses who could testify as to the factual, recorded material.

Then, as to the abovesaid facts, Mr. Decato followed suit at parties' *Daubert* hearing, *suppressio veri.*

185.    Mr. Decato, during parties' *Daubert* hearing, never explored any of the content in the Estate's audio evidence that Mr. O'Toole had researched thoroughly before the hearing. While content of the audio recordings had been submitted in response to defense discovery requests, Mr. O'Toole took the opportunity to consult other attorneys in the legal malpractice specialty with respect to evidence on the audio recordings. Notwithstanding, Mr. Decato never inquired of Mr. O'Toole during the *Daubert* hearing as to his legal expert's precise initiation of peer review, and exactly when over time Mr. O'Toole's study of the audio recordings had occurred.

186.    Before *Daubert* proceedings commenced, Mr. Decato promised the Estate executor he would demonstrate to the Court Mr. O'Toole's diligence with respect to Mr. O'Toole's having studied the case audio recordings and the methodology he used in assessing the audio content, but Mr. Decato did not. Judge Reiss reiterated as her last instruction at the very end of the *Daubert* hearing: "And I want the best evidence, the audiotapes. You can renew the request to admit them." (*Daubert* Hearing Transcript at 211:7-8)

187.    Mr. Decato, for reasons never disclosed, shirked the Court's interest and ultimately denied the Court the Estate's determinative evidence it needed to hear, as well as that evidence to see. Judge Reiss was clear that she wanted to know the relevance of the recordings "to the extent that Attorney O'Toole relied upon them in forming his opinions." (Case 5:14-cv-00095, Opinion Document No. 84 at 15, ¶ 3)

188.    After the *Daubert* hearing, Mr. Decato gave to the Estate executor a typed document executed by Mr. O'Toole that was wedged inside other papers from Mr. Decato's office.

The document, an affidavit composed by Mr. O'Toole, was later reformed and redacted by Mr. Decato in paragraphs wherein Mr. O'Toole had addressed resolutely Mr. Welch's deceit. These material facts as stated by Mr. O'Toole were not presented by Mr. Decato during the *Daubert* hearing. Very specific sections of Mr. O'Toole's affidavit testimony regarding Mr. Welch's deceit were redacted by Mr. Decato. In one such section of his affidavit, Mr. O'Toole had stated: "From my conversation with Dr. Totonelly and from reading Dr. Totonelly's affidavit, I do not find what Mr. Welch informed the trial court to be true." (*See,* Exhibit 23, Attorney Thomas O'Toole Affidavit.)

189.    The redactions by Mr. Decato of conclusions made by Mr. O'Toole in his affidavit for the Court's analysis were those facts Mr. Decato had disregarded in requesting answers from Mr. O'Toole at the *Daubert* hearing. Mr. O'Toole methodically articulated in his affidavit Dr. Totonelly's affirmation of deceitful conduct by Mr. Welch at pretrial; however, Mr. Decato mollified it by boldly redacting the affidavit content of Mr. O'Toole. Redacted by Mr. Decato from Mr. O'Toole's affidavit was that specific detail Judge Reiss had requested at the *Daubert* hearing as to the relevant date and circumstance of Mr. O'Toole's having listened to the case audiocassette recordings:

> I recall listening to the audiocassettes in 2012 … I listened to the tapes first. I then read the transcripts of the trial. These were my two main sources of material in formulating my opinions.

(*Id.*)

190.    As events unfolded, Mr. O'Toole's redacted post-hearing affidavit contained the exact material facts the Court was asking for in the *Daubert* hearing. Mr. O'Toole had indeed read and observed F.R.E. Rule 703 that states an expert may base an opinion on facts or data in a case that the expert has been made aware of or personally observed.

191.    Mr. Decato entirely omitted from the *Daubert* hearing legal analysis by Mr. O'Toole on Mr. Welch's fraud upon Vermont Superior Court.  Mr. O'Toole was prepared to address Mr. Welch's forgery of the "unsigned" and then signed affidavit submitted by Mr. Welch to the Superior Court, that changed at trial the direction of the Estate's case.

192.    On the Estate executor's retainment of Mr. Decato, Mr. Decato promised the executor he would prosecute Mr. Welch to the full extent for Mr. Welch's signature forgery in Vermont Superior Court, and expressly for the effect Mr. Welch's forgery had on undermining causation in the Estate's case at trial. When retained, Mr. Decato expressed special interest in the way Mr. Welch had blue-penciled his motion's Memorandum that initially introduced Mr. Welch's unsigned affidavit to the Superior Court. Mr. Welch delivered his motion "taped to the wreath on the Courthouse door," just before midnight on the eve of trial. This odd mode of delivery was gratuitously declared by Mr. Welch on page one of Mr. Welch's Motion. (Exhibit 13.)

193.    But when opportune for submitting at parties' *Daubert* hearing case facts supporting Mr. Welch's act of forgery, Mr. Decato turned a blind eye. Mr. Welch's discrete act of fraud Mr. Decato never put forward in parties' *Daubert* hearing despite the Estate's having forensic document examination evidence that the signature of "Benjamin Glick, M.D." in question was not genuine. (Exhibit 16.)

194.    Upon the Estate's retaining Defendants' law firm, an oral recording was made by Mr. Decato and the Estate executor of the Estate's case material agreed to and necessary to be prosecuted, inclusive of evidence pertaining to the signature forgery by Mr. Welch. Mr. Decato knew that he and his law practice were being retained by the Estate to prosecute Mr. Welch's machinations robustly, especially the content of Mr. Welch's falsified affidavit

in the name of Dr. Glick. Mr. Decato understood that the affidavit had spawned a turn of events at trial leading to questions that unraveled Dr. Glick's staunch, seven-year expert testimony as medical examiner and pathologist.

195.    Mr. Decato, however, stealthily upended his contractual resolve. Mr. O'Toole, during his deposition monitored by Defendants on December 9, 2015, had contested relevant discrepancies in the *Puppolo* opinion that Mr. Welch "retained another expert" to replace Dr. Totonelly. Consequently, Mr. Decato had proposed to Mr. O'Toole a plan to bring the Estate's medical expert Dr. Totonelly to the stand when expeditious to testify as to the dishonesty and abject deceit of Mr. Welch. This was the first promise Mr. Decato had made to the Estate executor. Since Mr. Welch had twisted the facts before Judge Suntag at trial, Dr. Totonelly agreed to testify at the *Daubert* hearing as to the truth of this matter, but Mr. Decato, at the eleventh hour, turned his back and did not make it happen.

196.    On January 5, 2017, Mr. Decato received by fax from Dr. Totonelly's medical office, the sworn affidavit of Dr. Totonelly in preparation for parties' *Daubert* hearing. Mr. Decato adamantly promised the Estate executor that he would, by Dr. Totonelly's testimony, expose the fraud Mr. Welch had perpetrated upon the trial court as Mr. Welch falsely declared his "impossible" attempts to contact Dr. Totonelly for trial in Vermont Superior Court. (Exhibit 8)

197.    As to Mr. Welch's fraud, Defendants relied on support from *Knott v. Pratt*, 158 Vt. 334, 335 (1992) that was essential to proving the Estate's case of legal malpractice against Mr. Welch. Plaintiff prepared itself to pass the *cause-in-fact* test for legal malpractice of Mr. Welch. Had Mr. Decato implemented via Mr. O'Toole Dr. Totonelly's testimony at parties' *Daubert* hearing and had Mr. O'Toole's examination by Mr. Decato been guided

for Mr. O'Toole to opine on the merits of the underlying malpractice case that gave rise to the Estate's legal negligence claim, the evidence of harm and damages that were directly caused by Mr. Welch's deceit would have been plainly apparent. *Knott* provided law that, with case evidentiary proof, the causal connection between Mr. Welch's fraudulent, dishonest acts and the injury that resulted to the Estate's case could have been drawn. Instead, Mr. Decato covered up Mr. Welch's legal malpractice and fraud.

198.    Mr. Decato, at parties' *Daubert* hearing, worsened matters by choosing to leave out of Mr. O'Toole's hardcopy deposition document its evidentiary deposition exhibits that were needed at the hearing for submission to the Court. Mr. O'Toole's deposition exhibits were material to legal causation, and Mr. Decato deprived the Court of the exhibits, all to the expressed chagrin of the Judge. (*Daubert* Hearing Transcript at 4:14-15, 22-24)

199.    It was proposed falsely by opposing counsel in *Daubert* argument that Mr. O'Toole had not seen the medical records of the Estate's case at the time of his deposition. The Court needed to know at the *Daubert* hearing that Mr. O'Toole had reviewed all case medical records and that Mr. O'Toole could testify as to his knowledge of them. No proper objection and/or argument was proffered by Mr. Decato.

200.    Mr. Decato never directed Mr. O'Toole in testimony to show that the methodology Mr. O'Toole brought to the table for analysis of Eva Puppolo's medical records was reasonable, credible, scientifically reliable, and accepted in the industry.

201.    Case medical records were contained within Defendants' 1,762 bates-stamped pages of parties' shared file, and Mr. O'Toole had brought with him to the *Daubert* hearing all medical records he had procured from his own case file. Mr. O'Toole's evidentiary materials included all trial documents that Mr. O'Toole had previously studied posttrial

five years before and in preparation for his December 9, 2015 deposition. But Mr. Decato never examined him to this end. Instead, during the *Daubert* hearing, opposing counsel inquired of Mr. O'Toole: "So you think now that you did review the medical records?" To which Mr. O'Toole responded: "I know I reviewed medical records … Absolutely." (*Id.*at 118:8-10)

202.   At trial, Mr. Welch had failed to present the Estate's evidentiary medical and forensic toxicological facts. Departures from the medical standard of care had been the proximate cause of Eva Puppolo's injuries at Crescent Manor and needed fully to be pled.

203.   Mr. Decato, in parties' *Daubert* hearing, was to examine Mr. O'Toole to demonstrate his legal expert's knowledge of medical and forensic toxicological facts relevant to Eva Puppolo's death. Mr. Decato, in the presence of the Estate executor, promised to engage Mr. O'Toole on Mr. O'Toole's research of supportive case law from the U.S. District for the State of Vermont and several other federal jurisdictions to demonstrate that Mr. O'Toole's testimony was scientific, held up to scrutiny with both medical and legal literature to support it, and that Mr. O'Toole's methodology in arriving at his conclusions was reasonable, credible, and accepted in the legal profession. However, Mr. Decato shirked his promise.

204.   Mr. Decato's technical mission during the *Daubert* hearing as agreed was to expose Mr. Welch's fraud, since fraudulent acts cannot be bona fide "trial strategy" or strategy as the exclusive providence of the lawyer. Mr. O'Toole was prepared for specific case argument to this effect, but Mr. Decato allowed Mr. Cleary to have way with Plaintiff's legal expert witness and Mr. Decato did not object and deliver. Mr. Decato represented to the Estate executor that he would in the future be able to argue to any end that was missed.

205.    Mr. Decato in 2015 made promises on a prosecutory plan to bring the Estate's case against Mr. Welch for all harm caused, as the Court in Opinion Document No. 88 appropriately held:

> Under Vermont law, the measure of damages for legal malpractice claims is all harm "proximately caused by an attorney's negligence[.] *Sachs v. Downs Rachlin Martin PLLC*, 2017 VT 100, ~ 29 n.4, 179 A.3d 182, 190.

(Case 5:14-cv-00095, Opinion Document No. 88 at 19, ¶ 3)

206.    The Estate executor, on secondarily reading this Court's first written Opinion, became aware of Defendants' deplorable acts that then shed light on Mr. Decato's personally and professionally having turned away from his convincingly sincere promises to prosecute Mr. Welch. The executor felt that Mr. Decato had thrown the case. Knowledge of Opinion Document No. 84's content placed the executor on notice regarding accrual of the Estate's claims against Mr. Decato for his fraudulent conduct as well as his acts in defiance of Vermont's Consumer Fraud Act.

207.    The Estate executor had never known of Mr. Decato's silent betrayal not to address opposing counsel Mr. Cleary's Statement of Undisputed Facts.  The Court held:

> Plaintiff's Statement of Disputed Facts [] fails to respond directly to Defendant's Statement of Undisputed Facts.

(Case 5:14-cv-00095, Opinion Document No. 84 at 2, ¶ 3)

208.    Defendants, having flouted federal court deadlines and defied a ruling the Court be supplied pivotal material evidence, topped off their defiance by not averting summary judgment on procedural and material grounds when held to dispute facts "not in dispute."

209.    Mr. Decato had never apprised the executor of those litigation defense traps that, in this case, became a road to recapitulation of the ploys and sabotage allowed to overtake the case in the custody of Mr. Welch.

210.    The twists of truth and untruths rendered and communicated to this Court by opposing counsel for Mr. Welch were admitted when, inexplicably, Mr. Decato did not answer a defense Statement of Genuine Material Facts Not In Dispute. The Estate executor did not know about Mr. Decato's not addressing the Statement or what the consequences would be until she read about it in Opinion No. 84. The executor was also unaware of the specific turns Mr. Decato had taken that facilitated a clear win for the defense. The executor never knew the unsustainable burden Mr. Decato was actively creating for the Plaintiff.

211.    Still Mr. Decato knew that the Estate executor would rely upon his representations, and the executor did rely upon them. Trustfully, the executor continued her relationship with Defendants as Mr. Decato continued to represent her against Mr. Welch and company.

212.    By unfair methods, Mr. Decato gained an unfair advantage over the Estate executor since the executor, having accepted his representations to be true, remained a willing client. The Estate executor continued to rely on Mr. Decato who, without the executor ruffling any feathers for him, benefited from his fraudulent misrepresentation by not getting caught in his hushed misdeeds and cover-up of Mr. Welch's misconduct, as to suffer any ethical penalties and/or disbarment pursuant to the Vermont Rules of Professional Conduct, most notably Rule 8.4(a), (b), (c), and (d).

213.    Mr. Decato continued his non-candid actions into the future for five years, while, for two of those years, he had maintained a façade of good and fair representation, as well as the posture of an honest and capable practitioner of law.

214.    But all the while Mr. Decato orchestrated cover-ups of earlier false and fraudulent actions by Mr. Welch that had misled the Vermont courts, as well as breached good faith requirements of his contractual agreements with the Estate executor.

215.    Continuing damage was caused to the Estate after Defendants prevented execution of recovery action in prosecuting Mr. Welch's frauds throughout case matters. Mr. Decato had a fiduciary duty to the Estate to disclose in the U.S. District Court all adverse, fraudulent matters that had devastatingly blighted the Estate's case.

216.    Additional injury and damages result in supplemental jurisdiction of the United States District Court for the District of Vermont, as is authorized by 28 U.S.C.A. § 1367.

217.    As a result of Mr. Decato's fraudulent misrepresentation and circumstantial pattern of false assertions and concealment made by him of case factual material, the Estate has suffered damages.

WHEREFORE, the Estate of Eva C. Puppolo, for next of kin and survivors, given Defendants' fraudulent misrepresentation over the course of their tenure, prays for Judgment as against Defendants jointly and severally, and for damages as aforesaid, thereupon in the amount of $15,531,000.00 together with punitive damages in the amount of $20,000,000.00, or an additional amount as determined by the Jury, as will deter others from fraudulent acts and actions; plus costs, interest, and such other relief as may be met.

## COUNT II – BREACH OF CONTRACT

218.    Plaintiff incorporates each of the foregoing paragraphs as if set forth fully herein, with said material evidence to support all stated facts and claims. While having engaged in conduct set forth in the abovesaid paragraphs, Defendants had an express contractual duty to provide truthful representation to their client. Mr. Decato materially breached his

contract for honest, truthful, and trustworthy provision of legal services to the Estate and its agent.

219.    Defendants' retainer contract with the Estate executor was a contingency agreement. (*See*, <u>Exhibit 24</u>, Defendants' Contingency Agreement with Estate executor, dated August 1, 2015.)

220.    Mr. Decato made recurrent false promises to the Estate executor in his enduring representation of the Estate's case. An attorney's confidential fiduciary relationship enables him to exercise strong influence over his client. At the same time, it affords him opportunities to obtain undue advantage by availing himself of the client's necessities, credulity, and liberality. (Rule 1.1(5), Rule 1.2(a), Rule 1.3(1), (2) and (3), and Rule 1.4(a)(1), (2) and (3), Vermont Rules of Professional Conduct.)

221.    The Rules of Professional Conduct are incorporated into a retainer agreement pursuant to Law of the Place doctrine. Mr. Decato by contract committed to prosecuting Mr. Welch for his fraud upon the Vermont Superior Court and fraud upon his client.

222.    Mr. Decato promised to expose Mr. Welch's fraud after Mr. Welch conspired not to call to trial the Estate's indispensable medical expert witness, Dr. Totonelly. Mr. Decato promised to submit the Estate's material forensic evidence and expose Mr. Welch's fraudulent affidavit that had spawned a turn of events at trial since it led to pivotal questions with respect to causation in the absence of Dr. Totonelly.

223.    Mr. Welch's last-minute ruse at case pretrial began as a calculated effort by him to feign before Vermont Superior Court that Dr. Glick, after Dr. Glick's seven-year service as medical examiner and pathologist expert in the Estate's case, was withdrawing his staunch causation testimony.

224.    In Opinion Document No. 88, this Court cited Mr. Decato's formally pled claims against Mr. Welch that Mr. Decato himself willfully and fraudulently disregarded to plead

after promising Plaintiff he would do so. Mr. Decato breached his promises to the Estate; all the promises that were made in an agreement while retaining him, and, at all times thereafter, Mr. Decato led his client to believe that he was taking care of the Estate's case. This Court cited these failures of Mr. Welch, which Mr. Decato, in turn, overtly ignored:

    a. the failure to use a police report at trial

    b. the failure to use hair sample forensics

    c. the failure to introduce evidence that Eva Puppolo's healthcare providers falsified records

    d. the failure to use audio tapes to impeach defense witnesses

    e. the failure to introduce Eva Puppolo's will at trial

(Case 5:14-cv-00095, Opinion Document No. 88 at 3, ¶ 2)

225.    Eva Puppolo's Last Will and Testament was important materially because Eva had bequeathed portions of her Estate to Crescent Manor and the practitioners who harmed her and caused her death. (*See,* Exhibit 25, Last Will and Testament, Eva C. Puppolo.)

226.    Mr. O'Toole was prepared to opine on the significance of Eva Puppolo's Will as pertained to her death. Many of the Estate's claims were precluded by Mr. Decato's untimely filing of Mr. O'Toole's legal expert report that caused the Court effectively to grant Mr. Welch's motion that the report "be precluded as a sanction for its untimely disclosure without justification." (Case 5:14-cv-00095, Opinion No. 84 at 18, ¶ 1)

227.    It was Mr. Decato's active shirking of his fiduciary responsibility that prompted the Court to opine that Mr. Decato's "noncompliance was willful" as well as "inexcusable" and to hold ultimately that "had Plaintiff prevailed in her legal malpractice claim against Defendants, she would have been able to recover the value of the Estate's claim for Eva Puppolo's bodily harm." (Case 5:14-cv-00095, Opinion Document No. 88 at 19–20, ¶ 3)

228.    Mr. Decato materially breached his agreement with the Estate executor because he did not perform as promised, concealed the Court's first Opinion from her, lied to her about the true significance of both Opinions' content, in reverse order one-before-the-other, and never ended his representation of the Estate until seven full years after his retainment.

229.    The multitude of attorney machinations, that at case conclusion were exacerbated by Mr. Decato's deceit and cover-up of Mr. Welch's frauds, belied Mr. Decato's original intentions that were communicated to the Estate executor by Mr. Decato on retainment. Mr. Decato's acts of fraudulent misrepresentation by their circumstantial pattern and number were intentional.

230.    Defense-spun argument, not limited solely to the foregoing, and antithetical to case material facts, appeared in the U.S. District Court's holdings due to false defense allegations chosen by Mr. Decato to be left entirely unaddressed and unopposed in parties' *Daubert* hearing and pleadings thereafter.

231.    Mr. Decato was retained as a litigation specialist as well as a fiduciary.  His actions in this matter, when analyzed with his circumstantial fact pattern of nondisclosure, cannot be labeled or categorized as unintentional. The "why" of Mr. Decato's actions remains hidden, but circumstantial evidence abounds of the likelihood of nefarious attorney conduct throughout, that was a violation of law and carried out to cover up capital criminal conduct by a host of actors.

232.    Mr. Decato had a duty of fiduciary honesty to enact all agreed upon actions with respect to the Estate as was promised to his client, as well as for the Estate's beneficiaries including all heirs. This duty required Mr. Decato to communicate accurate and truthful

72

information regarding his representation in the litigation. Duties had been agreed to, and deemed necessary and indispensable in his representative status.

233.    As a result of Mr. Decato's material breaches to his agreements with the Estate executor for the Estate of Eva C. Puppolo and with Celeste A. Puppolo individually in initiating a retainer contract, the Estate, its executor, and Ms. Puppolo personally have suffered damages.

WHEREFORE, the Estate of Eva C. Puppolo, for next of kin and survivors, given Defendants' tort of deceit arising from false inducement and resulting in pecuniary losses, prays for Judgment as against Defendants jointly and severally, and for damages as aforesaid, thereupon in the amount of $2,000,000.00 together with punitive damages in the amount of $5,000,000.00; plus costs, interest, and such other relief as may be found to have met the evidentiary requirements of law and/or valuation by a Jury.

## CLAIM FOR PUNITIVE AND/OR EXEMPLARY DAMAGES

234.    The monetary claims in this case are fairly valued at approximately $42,531,000.00 without consideration of interest as actuarially computed on the principal balance of known torts as is determined, approved, and projected to date at the statutory rate of interest.

235.    For the unlawful actions of fraud by Defendants, and given Mr. Decato's betrayal and deceit in not abiding by the Estate executor's contract with him in lieu of prosecution for fraud of Mr. Welch, the Honorable U.S. District Court for the District of Vermont or a Jury should consider, as configured above, the application of punitive damages plus costs, interest, and such other relief as may be met by considerations of the public interest, to deter others from the unlawful and deceitful actions pervading this case.

Docket # 2:24-cv-1238

DATED AT Williston, Vermont this 20th day of November 2024.

Respectfully submitted,

BY: _____

Timothy Byron Fair, Esq.
Fair Law Vermont
94 Zephyr Road
Williston, VT 05495
*Attorney for Plaintiffs*

Docket # 2:24-cv-1238

*In the*

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF VERMONT**

| | | |
|---|---|---|
| In Re: ESTATE OF EVA C. PUPPOLO<br>By: Celeste A. Puppolo, Executor | * | |
| and | * | Case No.:    2:24-cv-1238 |
| Celeste A. Puppolo,  Individually, | * | |
| *Plaintiffs* | | |
| v. | * | |
| R. PETER DECATO, ESQ<br>DECATO LAW OFFICE, P.C., | * | |
| and | | |
| Each Employee or Officer of<br>Decato Law Office or Surety<br>or Any Unknown Parties or<br>Persons Who Caused Harm<br>to Plaintiffs, | * | |
| *Defendants* | * | |

**JURY PRAYER**

Plaintiff in the above-captioned matter hereby respectfully prays for TRIAL BY JURY.

DATED AT Williston, Vermont this 20th day of November 2024.

Respectfully submitted,

BY: _____

Timothy Byron Fair, Esq.
Fair Law Vermont
94 Zephyr Road
Williston, VT 05495
*Attorney for Plaintiffs*